[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Boaston*, Slip Opinion No. 2020-Ohio-1061.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2020-OHIO-1061

THE STATE OF OHIO, APPELLEE, *v.* BOASTON, APPELLANT.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Boaston*, Slip Opinion No. 2020-Ohio-1061.]

*Criminal Law—Crim.R. 16(K)—It is error to admit expert opinion testimony when the expert's opinion was not set forth in a written report prepared in compliance with Crim.R. 16(K)—The trial court's admission of testimony that went beyond the scope of the expert's written report was harmless error as the remaining evidence overwhelmingly established appellant's guilt beyond any reasonable doubt—Court of appeals' judgment affirmed.*

(No. 2018-0364—Submitted June 11, 2019—Decided March 26, 2020.)

APPEAL from the Court of Appeals for Lucas County,

No. L-15-1274, 2017-Ohio-8770.

_____

DONNELLY, J.

{¶ 1} This discretionary appeal from a judgment of the Sixth District Court of Appeals presents us with the opportunity to construe Crim.R. 16(K). The issue is whether the admission of expert opinion testimony that was not set forth in a

written report is reversible error. We hold that it is error to admit expert opinion testimony when the expert's opinion was not set forth in a written report prepared in compliance with Crim.R. 16(K). In this case, however, the trial court's admission of testimony that went beyond the scope of the expert's written report was harmless error. Therefore, we affirm the judgment of the Sixth District Court of Appeals, although on grounds other than those stated in its opinion.

## I.  FACTS

{¶ 2} In April 2014, appellant, Ronald Boaston ("Boaston"), was indicted on one count of murder in violation of R.C. 2903.02(A) and one count of murder in violation of R.C. 2903.02(B) for the death of his ex-wife, Brandi Gonyer-Boaston ("Brandi").

{¶ 3} Boaston's trial began on September 15, 2015. The jury heard testimony from numerous witnesses, including the deputy coroner, family members, Brandi's co-workers and friends, police officers, and other law-enforcement personnel. Although Boaston did not take the stand, his recorded voluntary interviews with the police were played and admitted into evidence.

### A.  Early relationship history

{¶ 4} Boaston and Brandi were neighbors and met when 16-year-old Brandi began to babysit two of Boaston's children. At the time, Boaston was in his late 20s. When Brandi was 18, she became pregnant with the first of two children she and Boaston had together. They got married in 2005. Their marriage ended in 2006, according to Boaston, due to Brandi's infidelity. Although Boaston and Brandi never remarried, they reconciled the following year and lived together with their two children and three children from previous relationships. In early 2014, all seven were living together in a condominium unit on Amanda Circle, in Toledo, located in Lucas County.

**B. 2013**

{¶ 5} In 2013, Brandi graduated from nursing school and started working at a senior-care facility, Arbors of Waterville. Through her job, Brandi developed a friendship with Daron Walls-Jones ("Jones"), a co-worker. In the fall of 2013, Boaston discovered that Brandi and Jones were exchanging text messages. Because Boaston suspected that Brandi was being unfaithful, he had installed spyware on her cell phone, software that allowed him to monitor her text messages without her knowledge.

{¶ 6} In late-October 2013, Boaston contacted Jones and asked him if he was sleeping with Brandi. Although Jones denied having a sexual relationship with Brandi, Jones and Brandi decided to stop texting and instead began communicating by voice calls. Stymied by the inability to monitor Brandi and Jones's cell-phone calls, Boaston added a second spyware program to Brandi's phone that enabled him to record and listen to her voice conversations.

**C. 2014**

*1. Bathtub incident*

{¶ 7} Sometime near the end of January or the beginning of February 2014, Brandi and Boaston were in the bathroom together at their Amanda Circle residence. According to testimony elicited from several witnesses, Brandi told them that Boaston tried to drown her in the bathtub while she was taking a bath. Brandi suffered two black eyes and an injury to her nose. A neighbor who lived in the bordering condominium testified that one day during this time frame, she heard a woman's scream and the sound of running water coming from the Boaston residence through an adjoining wall.

{¶ 8} Boaston admitted that Brandi sustained a black eye and bruises one day when they had just finished taking a bath together. He claimed that after he stepped out of the tub, Brandi asked whether he intended to harm her. In response to this question, he forcefully splashed water two to three times at Brandi who was

lying back in the bathtub. Boaston denied striking Brandi or attempting to drown her, and instead claimed that Brandi had "spazzed out" and was somehow injured while overreacting to having water splashed in her face.

### 2. Brandi leaves

{¶ 9} On February 3, shortly after the bathtub incident, Brandi moved out of the Amanda Circle residence and moved in with her mother. Soon thereafter, Brandi and her mother applied to rent a mobile home together. After Brandi moved out, Boaston closed their joint checking account and opened his own personal checking and savings accounts.

{¶ 10} Although Brandi and Boaston's relationship remained tumultuous over the next several days, Brandi returned to the Amanda Circle residence nearly every day to prepare the children for school and to help them with homework in the afternoons.

### 3. Cell-phone activity

{¶ 11} Brandi purchased a new cell phone around the time of her move. Her number, however, remained unchanged, and Boaston was able to add spyware to this phone as well.

{¶ 12} At trial, the state introduced cell-phone communications it had retrieved for the time period from February 1 through February 15. According to the cell-phone records and Jones's testimony, Brandi and Jones resumed texting each other shortly after she moved out. Boaston monitored their communications and on numerous occasions contacted Brandi after a particularly suggestive communication. For instance, on one occasion after Brandi had texted Jones, "should have let me kidnap you," Boaston immediately texted Brandi, "I wish u would stop acting so hateful towards me."

{¶ 13} Boaston's phone-harassment campaign against Brandi persisted. On February 12, Brandi texted him, "Don't start being a jerk. i can call my kids * * * anytime I want." After this text, Boaston called Brandi eight times in six minutes

prompting Brandi to text: "Stop calling me. I'm not guna talk to u n hv u calln me a c**t." Despite Brandi's text, Boaston persisted, calling Brandi's phone seven more times over the next several minutes and texting, "Why wont u answer ur phone???"

{¶ 14} That same day, Boaston went to Brandi's mother's home while Brandi was there alone. Brandi called her mother and told her that Boaston was at the house. When Brandi's mother arrived home, she heard Boaston tell Brandi that "either [she] or [Jones] was gonna pay." Brandi's mother told Boaston to leave.

{¶ 15} That afternoon, Brandi also texted Jones that Boaston "just started trippn" and "[h]e f**kn came over n went through my phone n got pissed I was textn u. Don't know if he was threatn me or wat." Previously, Brandi had also told Jones that Boaston had pictures of Jones on a desk at the Amanda Circle condominium. Jones responded to Brandi's texts expressing his concerns about Boaston, and he and Brandi discussed taking a break from each other. In an attempt to reassure Jones, Brandi explained, "He just mad bc I won't go back he is not going to do anything to u or me bc he know he guna get in trouble if he does" and, "He don't want to lose the kids n he will if something happens."

*4. February 13 and early-morning hours of February 14*

{¶ 16} The next day, February 13, Brandi spent time alone with Boaston at the Amanda Circle residence before reporting to work for her shift, which started at 6:00 p.m. Earlier in the day, while Brandi slept, Boaston read the text messages on her phone because the spyware program attached to Brandi's new phone did not work as well as the earlier versions he had used. Additionally, Boaston purchased $20.00 of gas for Brandi's car at approximately 8:30 a.m. that morning.

{¶ 17} Brandi began her shift at Arbors of Waterville at 6:00 p.m. While at work, she and a co-worker made plans for the following night of February 14. Brandi and Jones began texting at approximately 8:30 p.m. By 10:30 p.m., their exchanges turned flirtatious and at roughly 12:15 a.m., the conversation was even

more sexually charged. At 12:25 a.m., Brandi invited Jones to come out with her and her co-worker the following evening and Jones agreed to meet them. At 1:25 a.m., Brandi texted, "Well wat if I jump on u?" to which Jones replied, "Well wat can I say." Brandi then asked, "U really want to do something or u playn around." Jones responded, "I do" and Brandi answered, "Well what should we do." Boaston texted Brandi six minutes later, but the text content was unrecoverable.

{¶ 18} Around 2:00 a.m. on February 14, Boaston drove to the apartment of his friend Matt Gwozdz.[1] Gwozdz's friend Mark Reno was there as well. Boaston admitted to having discussed his relationship problems with them.

{¶ 19} According to Reno, Boaston asked Reno for a gun or for someone to "take care of some business." Reno asked if they needed to "gather up the home boys and go take care of some shit," and whether someone needed to be "pistol-whip[ped]" or put "in ICU or something." Reno testified that Boaston responded, "Something like that, but deeper." At first, Reno thought Boaston was kidding. However, Reno then realized Boaston was serious and surmised that Boaston meant to do harm to some guy "that was f**king with his family." At some point after this discussion, Reno left Gwozdz's home. After he left, Boaston called Reno at 2:51 a.m. with his prepaid Verizon cell phone.[2] The call lasted for over eight minutes, and the record of the call was subsequently deleted from Boaston's phone. Reno testified that during the call, Boaston asked if they could "meet up tomorrow afternoon sometime and maybe have lunch and talk."

{¶ 20} At 2:59 a.m., Boaston purchased gas for his car. He then drove across town and at 4:06 a.m., withdrew $100 from an ATM.

{¶ 21} Brandi left work at approximately 7:00 a.m. Before she left, Brandi told a co-worker that she was going to Boaston's house to get the kids ready for

---

1. Matt Gwozdz was deceased at the time of trial.

2. Boaston had a prepaid Verizon cell phone, which he used infrequently, and a Sprint cell phone that he used on a regular basis for most of his texts and voice calls.

school, then was going back to her mother's to sleep, and would later drive one of Boaston's sons and his son's girlfriend to a restaurant for dinner.

### 5. February 14, 2014

{¶ 22} Boaston placed a call to Brandi at 6:40 a.m. According to Boaston, the purpose of the call was to confirm she was coming over to the Amanda Circle residence after work. Brandi returned Boaston's call at 7:02 a.m. On her way to Amanda Circle, Brandi stopped at a McDonald's near the condominium and bought two sausage breakfast sandwiches at 7:21 a.m. According to Boaston, he and Brandi ate the sandwiches shortly after Brandi arrived at the residence, and then Brandi helped the kids get ready for school.

{¶ 23} Boaston told Brandi's mother that Brandi took a shower after the kids left for school. According to Brandi's mother, Boaston said that he wanted to engage in intercourse, but when Brandi refused, Boaston said something to the effect of, "[I]f I were Daron you would," and "asked if she was saving it for Daron." In an interview with the police, Boaston stated that he and Brandi showered that morning and although he wanted to have sexual relations, Brandi declined because she had an upset stomach. According to Boaston, Brandi lay down, he rubbed her, and Brandi slept. Boaston told the police that when Brandi woke up, she put her dirty clothes back on, gave him a kiss, and left the house between 10:30 and 10:45 a.m. He said Brandi intended to return later that day to file their taxes, give his son a ride to dinner, and then celebrate Valentine's Day with the family.

### 6. Cell-phone records and activity

{¶ 24} A Toledo detective, an expert in cell-phone-record analysis, testified that cell-phone records show which cell towers and which side of a particular tower a given cell phone is transmitting signals to when the phone makes or receives a call. Further, the records offer an approximate distance between the cell phone and the tower receiving the signal. He explained that with this information, an expert

can determine the "general vicinity" a given phone was in at a particular time the device was used to make or answer a call.

{¶ 25} By tracking the signals sent from Brandi's and Boaston's phones to various cell-phone towers, the detective determined that both Boaston's and Brandi's cell phones were near the southeast sector of Tower 17 in the vicinity of the Amanda Circle residence until 10:41 a.m. that morning. At 11:15 a.m., Brandi's phone registered data use to a tower (Tower 929) in Fulton County, which is far west of the Amanda Circle residence. Twelve minutes later, at 11:27 a.m., Brandi's phone received an incoming call, registering to its final cell tower (Tower 976) from another location in Fulton County—approximately 20 miles from the Amanda Circle residence—where Brandi's body and her phone and SUV were eventually found the following morning.

{¶ 26} During this time period, Boaston's last registered phone activity occurred at 10:41 a.m. near the Amanda Circle residence. Boaston's phones did not record any activity from 10:41 a.m. until 11:36 a.m. Testimony established that a cell phone will not transmit signals to cell towers if it is turned off. At 11:36 a.m., Boaston's Sprint phone received an incoming call from one of his sons. At that time, Boaston's phone transmitted a signal to Tower 17, but not from the sector closest to Amanda Circle, suggesting he was near—but not at—the residence. Boaston called Brandi's phone at 12:04 p.m., at which point his phone was back near the Amanda Circle home.

{¶ 27} Boaston withdrew $60 from another ATM at 12:41 p.m. Between 12:04 and 1:48 p.m., Boaston called Brandi five times using his Sprint phone and texted her asking, "kids are going to be home soon. Did you still want to file taxes today or what?"

*7. February 15, 2014*

{¶ 28} Just before 8:00 a.m. on the morning of February 15, hunters discovered Brandi's SUV, with its engine running, parked in a snow-covered rural

field in Fulton County roughly 20 to 30 yards from the road. Two key fobs were lying on the passenger seat and one set of boot prints led from the driver's side of the vehicle to the road. The police were called to the scene.

{¶ 29} Brandi's body was discovered in the rear cargo area of the SUV. Clear, heavy plastic was partially wrapped around her body. Brandi was dressed in a shirt, pants pulled down to the mid-thighs, underwear, and a single sock. Two coats, one inside the other, were stuffed behind her body, along with some boots and shoes. Brandi's damaged cell phone was on the road nearby, and a McDonald's receipt, dated February 14 and time-stamped 7:21 a.m., was in the car.

### D. Physical and forensic evidence

{¶ 30} A special agent in the Crime Scene Unit of the Bureau of Criminal Investigation ("BCI") testified that BCI personnel vacuumed the plastic tarp with a handheld "forensic vacuum" and swabbed various areas of Brandi's body and the SUV for DNA testing.

{¶ 31} A DNA mixture was found on the vehicle's push-start button from which neither Boaston nor Brandi could be excluded. A DNA profile could not be obtained from the swabs taken from the rear driver's side interior door handle, the gear shifter, steering wheel, or trunk handle. However, the BCI DNA analyst testified that if someone was wearing gloves, that would prevent the transfer of DNA. The backs of Brandi's pant legs were swabbed in the knee and calf areas since someone carrying her body would likely have made contact with these areas. It was determined that both areas contained genetic material matching the Boaston-male profile and at least one other unidentified male profile.

{¶ 32} When Boaston was interviewed by the police on February 15, detectives noticed two small scratches on his face and neck. Also, in an area just below the hood of Boaston's sweatshirt, police identified a 2.5-inch rip in a seam, which corresponded with the scratch wounds on the back of his neck. Testing near the rip revealed Boaston's DNA but was "inconclusive" as to Brandi, which meant

that she could not be included or excluded as the contributor. The sweatshirt sleeves tested positive for Boaston's and Brandi's DNA and also revealed additional DNA. That additional DNA, however, was not sufficient for comparison. Detectives found a glove in each pocket of Boaston's coat. Each glove had a Velcro strap and buckle that could be tightened around the wrist. One of the gloves had a lot of long, light-brown human hair embedded in an outer Velcro strap and buckle that appeared to have been forcefully "pulled" from the head. The buckles on the gloves and the hair were tested. The right glove buckle contained DNA, but not from Brandi. Boaston's left glove buckle did not contain sufficient material for testing, which could mean no DNA was even present. The hair was a match for Brandi's DNA.

{¶ 33} The Amanda Circle residence was searched, but no blood evidence was found.

### E. Deputy-coroner testimony

{¶ 34} The forensic pathologist/deputy coroner, Dr. Scala-Barnett, testified that Brandi suffered visible injuries to her neck and face and that her face was dark purple in color, a condition consistent with asphyxiation. Brandi had an abrasion under her chin, with bruising and a laceration inside her lower lip. She had hemorrhages associated with asphyxiation in her eyeballs and different layers of her neck muscles, and she had numerous tiny, pinpoint hemorrhages all over her face and eyelids. The deputy coroner concluded that the cause of death was strangulation and the manner of death was homicide.

{¶ 35} Dr. Scala-Barnett examined the stomach contents as part of the autopsy protocol. She testified that a victim's stomach contents may prove to be helpful information if it is known when the victim last ate. She explained that digestion ceases once a person is dead. She testified that Brandi had 110 cubic centimeters, just over three ounces, of food material in her stomach, including recognizable meat particles. Dr. Scala-Barnett said that during the digestion of a

small meal, such as a breakfast sandwich, "gastric contents will start to empty in about two hours." She concluded that "based on a reasonable degree of scientific certainty," Brandi died "within one to two hours after she ate her sandwich."

{¶ 36} Two days after the autopsy, a detective brought in a glove collected from Boaston for a side-by-side comparison of a rectangular abrasion under Brandi's chin. Dr. Scala-Barnett testified that she "test-fit" a buckle on one of the gloves by putting a clear plastic sheet over Brandi's face and placing the buckle against the abrasion. Dr. Scala-Barnett testified that the abrasion was consistent with the pattern, shape, and roughened material of the buckle and Velcro on one of Boaston's gloves.

### F. Conviction

{¶ 37} After a six-day trial, the jury deliberated for three and a half hours and returned with guilty verdicts for both murder counts. Boaston was sentenced to a mandatory prison term of 15 years to life.

## II. ARGUMENTS

### A. Information relevant to arguments

{¶ 38} During the course of discovery, the state provided the deputy coroner's written autopsy report. The report detailed Dr. Scala-Barnett's findings, which included her determinations as to the appearance and weight of the contents in Brandi's stomach, but did not include her opinion as to the time of death based on those stomach contents. This report was turned over to defense counsel more than a year before the trial began in September 2015.

{¶ 39} In addition, during the course of discovery, the state produced numerous photographs of Brandi's body. One photograph was a close-up of Brandi's face, which showed a distinct rectangular abrasion below her chin. Another photograph depicted that same area of Brandi's face covered with a sheet of flexible plastic wrap with a buckle of a glove laid against the abrasion to permit a visual comparison of the size and shape of the abrasion and the buckle on the

glove. The state also produced a detective's report regarding his comparison of the chin abrasion with the glove buckle. However, the coroner's report did not mention the test-fit that was conducted or Dr. Scala-Barnett's opinion on this topic.

{¶ 40} Dr. Scala-Barnett met with defense counsel 19 days before trial and, based on the findings contained in the autopsy report, shared her opinion as to Brandi's time of death and her opinion that the shape of the abrasion under Brandi's chin was consistent with the shape of the buckle on a glove that had been collected from Boaston. Defense counsel then "suggested" that the state supply a supplemental report, but the state chose not to provide one.

{¶ 41} At trial, defense counsel moved to exclude any opinion testimony by the deputy coroner as to the time of death and glove-buckle comparisons because Dr. Scala-Barnett failed to provide a written report summarizing these opinions at least 21 days prior to trial, as required by Crim.R. 16(K), or alternatively, she failed to supplement her report with an addendum following defense counsel's meeting with her. The trial court overruled counsel's objections and permitted the opinion testimony, noting that defense counsel had the autopsy report well in advance of trial and had "chose[n]" to meet with Dr. Scala-Barnett 19 days before the trial began. The court of appeals upheld the trial court's judgment based on the trial court's broad discretion in regulating the admission of evidence and on waiver. 2017-Ohio-8770, 100 N.E.3d 1002, ¶ 49. We accepted the discretionary appeal.

## B. Arguments of the parties

{¶ 42} Boaston argues that the state's failure to supply a written report providing the deputy coroner's opinions and "scientific reasoning" that (1) Brandi died within one to two hours after eating and (2) the bruise under Brandi's chin was consistent with Boaston's glove violated Crim.R. 16(K). He claims that these "two critical opinions * * * provide[d] the only circumstantial links to implicate [him] with the murder." Therefore, Boaston contends that "the trial court was mandated

to prohibit" Dr. Scala-Barnett's testimony on these topics pursuant to Crim.R. 16(K), and that its admission entitles him to a new trial.

{¶ 43} The state asserts, among other arguments, that Crim.R. 16(K) simply requires "a written report summarizing 'the expert witness's testimony, findings, analysis, conclusions, or opinions' " and does not require "scientific reasoning." Therefore, it contends the rule did not require the exclusion of certain portions of Dr. Scala-Barnett's opinion testimony that were not specifically articulated in the autopsy report. The state also argues, in the alternative, that even if it did violate Crim.R. 16(K), the rule is subject to the requirements of Crim.R. 52 so that error in the admission of an expert opinion not specifically stated in the deputy coroner's written report is reversible only when the error is prejudicial to the defendant's substantial rights.

### III. LAW AND ANALYSIS
### A. Crim.R. 16

{¶ 44} Crim.R. 16 governs discovery in criminal cases. Effective July 1, 2010, Crim.R. 16 underwent comprehensive changes in large part to strengthen the protections of a defendant's constitutional due-process rights to a fair trial. Grove, *Criminal Discovery in Ohio: "Civilizing" Criminal Rule 16*, 36 U.Dayton L.Rev. 143, 144-145 (2011). The new Crim.R. 16 promoted "more open discovery," *id*. at 144, leveling the playing field by strengthening the defendant's right to know the evidence the state will present against him at trial.

{¶ 45} Crim.R. 16 begins by providing that the purpose of the rule is:

[T]o provide all parties in a criminal case with the information necessary for a full and fair adjudication of the facts, to protect the integrity of the justice system and the rights of defendants, and to protect the well-being of witnesses, victims, and society at large.

13

Crim.R. 16(A).

{¶ 46} As part of the rule's changes in 2010, Crim.R. 16(K) was adopted, requiring that expert witnesses generate written reports and that those reports be disclosed to the opposing party no later than 21 days before trial. *See State v. Walls,* 2018-Ohio-329, 104 N.E.3d 280, ¶ 27 (6th Dist.). Crim.R. 16(K) states:

> An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications. The written report and summary of qualifications shall be subject to disclosure under this rule no later than twenty-one days prior to trial, which period may be modified by the court for good cause shown, which does not prejudice any other party. Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial.

{¶ 47} Here, to be clear, an autopsy report was provided to the defense well in advance of 21 days before trial, so this is not a case involving the admission of expert testimony in the complete absence of an expert report. But that report did not contain all the opinions that the state ultimately sought to elicit from the deputy coroner at trial. The question, then, is whether Crim.R. 16(K) required the exclusion of Dr. Scala-Barnett's testimony that went beyond the scope of her written autopsy report.

{¶ 48} Consistent with the overall purpose of Crim.R. 16, lower courts have found that " '[t]he purpose of Crim.R. 16(K) is to avoid unfair surprise by providing notice to the defense and allowing the defense an opportunity to challenge the expert's findings, analysis, or qualifications, possibly with the support of an adverse expert who could discredit the opinion after carefully reviewing the written

report.' " *State v. Fetty,* 11th Dist. Portage No. 2011-P-0091, 2012-Ohio-6127, ¶ 36, quoting *State v. Perry*, 11th Dist. Lake No. 2011-L-125, 2012-Ohio-4888, ¶ 55; *see also State v. Buck*, 2017-Ohio-273, 81 N.E.3d 895, ¶ 33 (9th Dist.).

{¶ 49} Here, the state provided Dr. Scala-Barnett's autopsy report to defense counsel over one year before trial. Of no less importance, defense counsel met with Dr. Scala-Barnett 19 days before trial and learned her conclusions regarding Brandi's stomach contents and time of death and the glove-buckle comparison. To the extent that Crim.R. 16(K) gives a trial court discretion to adjust the date for the production of a report, the production of a supplemental report could have cured any noncompliance with the rule without prejudicing Boaston's right to a fair trial.

{¶ 50} Moreover, there is no suggestion that Dr. Scala-Barnett's unwritten opinions affected Boaston's defense strategy. No continuance was requested. In fact, defense counsel engaged in a rigorous cross-examination of Dr. Scala-Barnett as to her time-of-death and glove-buckle-analysis opinions. *See State v. Mobley,* 2d Dist. Montgomery No. 26858, 2016-Ohio-4579, ¶ 36 (defendant failed to demonstrate prejudice when he made no showing of surprise or a need for additional information or that he would have obtained his own expert if he had known the expert's opinion earlier); *see also State v. Groesser,* 5th Dist. Stark No. 2017CA00182, 2018-Ohio-2713, ¶ 30 (defendant was aware before trial of the substance of testimony to be offered by witnesses, and he failed to elucidate with any specificity how, even assuming the witnesses had testified as experts, the lack of a report prevented him from retaining his own expert witness). Insofar as the purpose of Crim.R. 16 is to avoid unfair surprise, no such unfair surprise occurred here. But that does not end our analysis.

{¶ 51} Appellate courts have split on the issue whether trial courts must exclude expert testimony in all cases of noncompliance with Crim.R. 16(K). Some courts have held that exclusion is not always required, reasoning that a trial court

retains discretion in regard to evidentiary matters. *See State v. Proby,* 10th Dist. Franklin No. 14AP-1067, 2015-Ohio-3364, ¶ 32-33; *State v. Opp*, 3d Dist. Seneca No. 13-13-33, 2014-Ohio-1138, ¶ 16; *State v. Retana,* 12th Dist. Butler No. CA2011-12-225, 2012-Ohio-5608, ¶ 53-54.

**{¶ 52}** Other courts have found that Crim.R. 16(K) removes the trial court's discretion and mandates the exclusion of expert testimony when a written report has not been disclosed in accordance with the rule. *Walls,* 2018-Ohio-329, 104 N.E.3d 280, at ¶ 31; *State v. Hall,* 1st Dist. Hamilton Nos. C-170699 and C-170700, 2019-Ohio-2985, ¶ 20; *State v. McGhee*, 11th Dist. Trumbull No. 2014-T-0106, 2017-Ohio-5773, ¶ 21.

**{¶ 53}** Many of the cases that rely on a court's broad discretion in regulating the admission of evidence, *see, e.g., Proby* at ¶ 33, cite to another section of the rule, namely Crim.R. 16(L)(1), which states:

> The trial court may make orders regulating discovery not inconsistent with this rule. If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances.

**{¶ 54}** Here, the Sixth District appeared to follow this reasoning.[3] 2017-Ohio-8770, 100 N.E.3d 1002, at ¶ 44, 52-53. However, we cannot subscribe to this

---

3. The appellate court also concluded that Boaston waived the issue by not raising it at trial pursuant to Crim.R. 12(C)(4). 2017-Ohio-8770, 100 N.E.3d 1002, at ¶ 50, 53. This is a misreading of Crim.R. 12(C)(4). Crim.R. 12(C)(4) does not require a party to object to *every* Crim.R. 16 discovery violation before trial. The rule simply requires that a party must raise objections regarding requests

analysis for the simple fact that the plain language of Crim.R. 16(K) limits the trial court's discretion and provides its own specific remedy for a violation of the rule. *See State ex rel. Law Office of Montgomery Cty. Pub. Defender v. Rosencrans*, 111 Ohio St.3d 338, 2006-Ohio-5793, 856 N.E.3d 250, ¶ 23 ("To interpret court rules, this court applies general principles of statutory construction"). Thus, if a court rule is unambiguous, it is to be applied as written. *Erwin v. Bryan,* 125 Ohio St.3d 519, 2010-Ohio-2202, 929 N.E.2d 1019, ¶ 22.

{¶ 55} The plain language of Crim.R. 16(K) expressly provides the consequence for failing to disclose an expert's report as required: "Failure to disclose the written report to opposing counsel *shall preclude* the expert's testimony at trial." (Emphasis added.) Crim.R. 16(L)(1) implicitly acknowledges this remedy: "The trial court may make orders regulating discovery *not inconsistent with this rule*." (Emphasis added.) And while Crim.R. 16(K) confers some measure of discretion on trial judges, it is limited to modifying the 21-day requirement "for good cause shown, which does not prejudice any other party."

### B. Inadmissible Expert Testimony

{¶ 56} In this case, it is clear that Dr. Scala-Barnett formed opinions as to when Brandi's death occurred and whether Boaston's glove buckle could have caused the rectangular abrasion under Brandi's chin. These opinions—and the studies she discussed regarding her time-of-death opinion—were not set forth in her autopsy report. The significance of the time-of-death opinion based on the stomach-content findings is important because it puts Brandi's time of death during a period when Boaston admitted to having been alone with Brandi at his residence. Additionally, the glove-buckle comparison provided an explanation for what may

---

*for* discovery under Crim.R. 16 before trial. Here, Boaston's motion was to *exclude* evidence that the state sought to introduce—the deputy coroner's time-of-death and glove-buckle-comparison testimony—that was not properly included in the written report required under Crim.R. 16(K).

have caused the distinct chin abrasion likely inflicted during Brandi's struggle or her strangulation.

{¶ 57} Because these were opinions that Dr. Scala-Barnett formulated and the state intended to offer into evidence, they should have been set forth in a report or supplemental report pursuant to Crim.R. 16(K). This would have placed Boaston on formal notice of this substantive opinion testimony and given him the opportunity to seek other expert-opinion testimony on these issues. Even the state's brief concedes that "Crim.R. 16(K) *would* have been satisfied through a single additional sentence: 'I will testify that the victim died within 1 to 2 hours after she ate a breakfast sandwich and that the buckle on the glove marked as an exhibit appears consistent in shape and pattern with the mark on the victim's neck.' "[4] (Emphasis added.)

{¶ 58} We agree with Boaston that the state violated Crim.R. 16(K) by failing to provide a written report that contained Dr. Scala-Barnett's opinions on these topics. The trial court accordingly erred in allowing the opinion testimony that went beyond the scope of the supplied expert report.

{¶ 59} We therefore hold that it was error to admit Dr. Scala-Barnett's opinion testimony on Brandi's time of death and the glove-buckle comparison, as those topics were not set forth in a written report prepared in compliance with Crim.R. 16(K). Having found that the admission of this evidence was error, we now consider whether that error was harmless.

### C. Harmless Error

{¶ 60} We agree with the reasoning advanced in *Walls* and *Hall,* which found that Crim.R. 16(K) removes a trial court's discretion and mandates the exclusion of expert testimony when a written report was not disclosed in accordance with the rule. However, this did not end the analysis in those cases.

---

4. We take no position as to whether the limited disclosure envisioned by the state would in fact satisfy the requirements of Crim.R. 16(K).

After finding that the trial courts erred in admitting the expert testimony, the courts of appeals next considered Crim.R. 52 and applied the harmless-error analysis established in *State v. Morris,* 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 23, in order to determine whether the error was reversible. *Walls,* 2018-Ohio-329, 104 N.E.3d 280, at ¶ 40-41; *Hall,* 2019-Ohio-2985, at ¶ 20. We agree with this approach.

{¶ 61} Crim.R. 52(A) provides: "Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." *See also Morris* at ¶ 24. ("not every error requires that a conviction be vacated or a new trial granted"). Furthermore, R.C. 2945.83 states:

> No motion for a new trial shall be granted or verdict set aside, nor shall any judgment of conviction be reversed in any court because of:
>
> * * *
>
> (C) The admission or rejection of any evidence offered against or for the accused *unless it affirmatively appears on the record that the accused was or may have been prejudiced thereby;*

(Emphasis added.)

{¶ 62} Under Crim.R. 52, in order to prejudice a defendant's substantial rights, the error " 'must have affected the outcome of the [trial] court proceedings.' " *State v. Fisher*, 99 Ohio St.3d 127, 2003-Ohio-2761, 789 N.E.2d 222, ¶ 7, quoting *United States v. Olano*, 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

{¶ 63} In *State v. Harris,* 142 Ohio St.3d 211, 2015-Ohio-166, 28 N.E.3d 1256, we set out the three-part analysis, established previously in *Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, that should guide appellate courts in

determining whether the erroneous admission of certain evidence affected the defendant's substantial rights so as to require a new trial or whether the admission of that evidence was harmless error under Crim.R. 52(A):

> First, it must be determined whether the defendant was prejudiced by the error, i.e., whether the error had an impact on the verdict. [*Morris*] at ¶ 25 and 27. Second, it must be determined whether the error was not harmless beyond a reasonable doubt. *Id.* at ¶ 28. Lastly, once the prejudicial evidence is excised, the remaining evidence is weighed to determine whether it establishes the defendant's guilt beyond a reasonable doubt. *Id.* at ¶ 29, 33.

*Harris* at ¶ 37*; see also State v. Arnold*, 147 Ohio St.3d 138, 2016-Ohio-1595, 62 N.E.3d 153, ¶ 50 (plurality opinion).

{¶ 64} Applying that analysis here, we first fail to see how Boaston was prejudiced by the admission of this evidence. The time-of-death opinion was not essential to the state's prosecution of the charged crimes. It was relevant only because of Boaston's voluntary statement to the police admitting that he and Brandi ate sausage sandwiches shortly after Brandi arrived at the condominium and that Brandi left between 10:30 and 10:45 a.m. that morning. The deputy coroner's time-of-death opinion merely corroborated the precise time frame that Boaston's own statement and relevant cell-phone records already established. Likewise, Dr. Scala-Barnett's glove-buckle testimony did little more than connect dots that were all too readily apparent. Thus, we do not find that Boaston was truly prejudiced by the admission of this evidence.

{¶ 65} And even without the deputy coroner's opinion testimony on Brandi's time of death and the glove-buckle comparison, the remaining evidence overwhelmingly establishes Boaston's guilt beyond any reasonable doubt.

{¶ 66} The jury heard evidence of Boaston's jealousy; his controlling behavior, including his use of three different types of software to monitor Brandi's text messages and phone calls; his tumultuous relationship with Brandi, established through text messages and eyewitness testimony; his refusal to accept Brandi's decision to leave the relationship; and his threat to harm her or Jones. Further, the record reflects clear evidence of Brandi's desire to end her relationship with Boaston, including her decision to move out of the Amanda Circle residence, applying for alternate housing with her mother, and her text message to Jones— "He just mad bc I won't go back."

{¶ 67} Boaston's actions taken in preparation of Brandi's murder provide ample evidence of his guilt. Boaston withdrew $100 from an ATM and the jury could have concluded that this money was used as payment for his ride back into town from Fulton County several hours later; Boaston put $20 worth of gas into Brandi's SUV and the engine was running when her car was found, which may have been because he intended for the vehicle to be found quickly in order to support the alibi he attempted to create; his February 14 early-morning visit to a friend's home and incriminating request to Mark Reno for assistance "to take care of business," closely followed by an eight-minute phone conversation with Reno on Boaston's prepaid phone that Boaston attempted to delete any record of; and his early-morning call to Brandi to make sure she came over to the Amanda Circle residence after leaving work.

{¶ 68} As previously discussed, Boaston's admissions are consistent with the time line of cell-phone activity that occurred the morning of February 14. Boaston's and Brandi's cell phones registered activity near the Amanda Circle residence during the time frame when Brandi left work until around 10:41 a.m. Brandi's phone used data in Fulton County at 11:15 a.m., which is fairly distant from the Amanda Circle residence. At 11:27 a.m., Brandi's cell phone registered to the cell tower closest to where it was found the next day, which was near the

location where her body was discovered. During this same time period, Boaston's phones did not register any activity until his Sprint phone, which was in a sector of Tower 17—though not the sector closest to the Amanda Circle residence—received his son's call at 11:36 a.m. It was established that a phone that has been powered off will not register activity, so Boaston could have deliberately avoided any detection of the location of his phones while he drove Brandi's SUV to Fulton County and during his return trip to Toledo.

{¶ 69} Brandi's body was discovered in the rear of her SUV in a dry but partially dressed state, partially wrapped in plastic sheeting. Only one set of footprints appeared in the snow leading away from the vehicle and toward the road, suggesting that her killer had assistance with transportation back to Toledo. It strains credulity to think that in the span of 46 minutes, Brandi left the Amanda Circle residence, was abducted by an unidentified assailant who partially undressed and killed her, wrapped her in plastic, stashed her body along with her dry clothing and shoes in the rear of her vehicle, drove the SUV 20 miles away, abandoned it off the country road, and mysteriously disappeared without a trace.

{¶ 70} After applying the harmless-error analysis established in *Morris,* as articulated in *Harris,* we conclude that the improper admission of Dr. Scala-Barnett's testimony beyond the scope of her report did not affect the substantial rights of Boaston. The remaining evidence adduced by the state established his guilt beyond any reasonable doubt. Therefore, Boaston is not entitled to a new trial.

### IV. CONCLUSION

{¶ 71} We hold that it is error to admit expert opinion testimony when the expert's opinion was not set forth in a written report prepared in compliance with Crim.R. 16(K). In this case, however, the trial court's admission of testimony that went beyond the scope of the expert's written report was harmless error. We therefore affirm, albeit on different grounds, the judgment of the Sixth District Court of Appeals.

Judgment affirmed.

O'CONNOR, C.J., and FRENCH and DEWINE, JJ., concur.

KENNEDY, J., concurs, with an opinion.

FISCHER, J., concurs in judgment only.

STEWART, J., concurs in part and dissents in part, with an opinion.

_____

**KENNEDY, J., concurring.**

{¶ 72} I concur with the majority opinion because I must. While I continue to believe that our decision in *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, was wrongly decided, it is nonetheless controlling precedent in this case.

{¶ 73} I agree with the majority that the Sixth District Court of Appeals erred in holding that appellant, Ronald Boaston, waived his objection to expert opinion that was not previously disclosed in the expert's written report and that the failure to disclose that opinion before trial mandated its exclusion from evidence. Crim.R. 16(K) requires the proponent of expert testimony to disclose a written report of the expert's opinions, and therefore it is the duty of the proponent to ensure that all relevant testimony it wishes to elicit at trial is included in the report. Boaston had no duty to second-guess the state's litigation strategy by alerting it to incriminating evidence that was omitted from its expert's report, and the trial and appellate courts therefore improperly shifted the burden to him to ensure that the rule was followed. The consequence of the state's failure to comply with Crim.R. 16(K) is automatic—it "shall preclude the expert's testimony."

{¶ 74} The issue, then, is whether the trial court's improper admission of evidence is harmless or reversible error.

{¶ 75} In *Morris*, this court adopted a new harmless-error test for instances when the erroneous admission of evidence during a defendant's trial affected his or her nonconstitutional rights. Such evidence will be deemed harmless under

23

Crim.R. 52(A) if the state demonstrates that the erroneous admission was harmless beyond a reasonable doubt and that the error did not contribute to the defendant's conviction. *Id.* at ¶ 28-30. As I explained in my dissent in *Morris*, this standard erroneously conflates the analysis applicable when a trial error violates the accused's constitutional rights with the analysis that applies for other trial errors. *Id.* at ¶ 61-64 (Kennedy, J., dissenting). When a constitutional error is involved, the state bears the burden to prove that the error was harmless beyond a reasonable doubt, such as by showing that there is overwhelming evidence of guilt. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *State v. Hood*, 135 Ohio St.3d 137, 2012-Ohio-6208, 984 N.E.2d 1057, ¶ 43. A lesser showing is required when the trial error does not implicate a constitutional right. *Morris* at ¶ 61 (Kennedy, J., dissenting); *id.* at ¶ 43 (O'Donnell, J., dissenting) (explaining that an "error is harmless if the state can demonstrate that it is more likely than not that the error did not affect the outcome of the trial").

{¶ 76} In construing Crim.R. 52(A)'s harmless-error provision, this court has previously relied on decisions from the United States Supreme Court addressing the analogous provisions of the Federal Rules of Criminal Procedure. *E.g., State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 15, citing *United States v. Olano*, 507 U.S. 725, 741, 113 S.Ct. 1770, 123 L.Ed.2d. 508 (1993). I therefore adhere to the view expressed in my dissent in *Morris* that the nonconstitutional harmless-error test originally set forth in *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), is the proper framework for reviewing an evidentiary error that was objected to at trial. *Morris* at ¶ 55, 66 (Kennedy, J., dissenting). That test provides that " 'without stripping the erroneous action from the whole,' an error is harmless if the outcome was 'not substantially swayed by the error.' " *Id.* at ¶ 55, quoting *Kotteakos* at 765. "The inquiry cannot be merely whether there was enough to support the result, apart from the phase

24

affected by the error. It is rather, even so, whether the error itself had substantial influence." *Kotteakos* at 765.

{¶ 77} Although I continue to believe that *Morris,* 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, was wrongly decided, it remains binding precedent. For this reason, we adhered to principles of stare decisis and applied its three-part test in *State v. Harris*, 142 Ohio St.3d 211, 2015-Ohio-166, 28 N.E.3d 1256, ¶ 37-44. Nonetheless, in this case, the result would not be any different if the court applied what I believe to be the proper standard of harmless-error review for nonconstitutional error, which is a less stringent showing than is required by *Morris*.

{¶ 78} Here, the state built a strong circumstantial-evidence case against Boaston for the killing of his ex-wife, Brandi Gonyer-Boaston, presenting evidence of prior domestic violence, controlling behavior, stalking, harassment, and jealousy. There also was evidence suggesting that Boaston had planned the murder after Gonyer-Boaston decided to end their relationship. Moreover, his cell phone disappeared from the cell-tower network for 55 minutes, a sufficient amount of time to take Gonyer-Boaston's body to Fulton County and return home. And based on his own statements, Boaston was the last known person to have seen Gonyer-Boaston alive. He admitted that she had been in his apartment from around 7:30 a.m., when they each ate fast-food breakfast sandwiches together, until she left his apartment between 10:30 and 10:45 a.m. that day.

{¶ 79} The trial court erroneously allowed the state to present expert testimony that Gonyer-Boaston died "within one to two hours after she ate her sandwich" when that opinion had not been disclosed to Boaston's defense counsel during discovery in accordance with Crim.R. 16(K). This testimony helped the state establish the victim's time of death and placed her with Boaston in his apartment when she died. However, the expert's opinion did nothing more than close the loop on the state's case. Review of the whole record demonstrates that

there was overwhelming circumstantial evidence that Boaston murdered Gonyer-Boaston, and circumstantial evidence " 'inherently possess[es] the same probative value' " as direct evidence, *State v. Martin*, 151 Ohio St.3d 470, 2017-Ohio-7556, 90 N.E.3d 857, ¶ 112, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph one of the syllabus.

{¶ 80} Because there is no indication that the jury was substantially swayed by the erroneously admitted evidence in a way that affected the outcome of Boaston's trial, the evidentiary error is harmless.

{¶ 81} Accordingly, I concur with the majority's judgment to affirm the court of appeals' decision upholding Boaston's murder conviction.

_____

**STEWART, J., concurring in part and dissenting in part.**

{¶ 82} I agree with the majority that it was error to admit the deputy coroner's testimony regarding Brandi Gonyer-Boaston's ("Brandi") time of death and the similarity between an abrasion found under Brandi's chin and the buckles on the gloves of appellant, Ronald Boaston ("Boaston"). However, because I find that the erroneous admission of that evidence had a substantial impact on the jury's verdict and that the remaining evidence failed to establish Boaston's guilt beyond a reasonable doubt, I dissent from the majority's conclusion that the error was harmless.

{¶ 83} In concluding that the introduction of the deputy coroner's opinion testimony amounted to harmless error, the majority uses the three-part harmless-error test established by this court in *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, and embraced in *State v. Harris*, 142 Ohio St.3d 211, 2015-Ohio-166, 28 N.E.3d 1256. *See also State v. Arnold*, 147 Ohio St.3d 138, 2016-Ohio-1595, 62 N.E.3d 153, ¶ 50 (plurality opinion). I agree with the concurring opinion that *Morris* is problematic. Not only did *Morris* do away with any distinction in how Ohio courts review trial errors affecting constitutional rights

versus those affecting nonconstitutional rights, but the three-prong test that emerged as a result is redundant and confusing to apply. Nevertheless, the test set forth in *Morris* is the prevailing law in Ohio and the parties have not asked us to reconsider that decision. Accordingly, I apply the *Morris* test, which requires the state to show that the error did not impact the verdict and the remaining evidence established guilt beyond a reasonable doubt, *Morris* at ¶ 33.

{¶ 84} According to the opinion testimony of the deputy coroner, Dr. Diane Scala-Barnett, Brandi would have died "[w]ithin one to two hours after she ate her breakfast sandwich" based on Dr. Scala-Barnett's examination of Brandi's stomach contents. Evidence in the record established that Brandi ate her breakfast soon after arriving at Boaston's residence around 7:30 a.m. on the day of her murder. Thus, the deputy coroner's testimony placed Brandi at Boaston's residence at the time she is estimated to have died and affirmatively contradicted Boaston's statement that Brandi left his home around 10:30 a.m. that day. Similarly, Dr. Scala-Barnett's testimony that the size and shape of an abrasion under Brandi's chin matched the size and shape of a buckle on Boaston's glove had the effect of directly implicating Boaston as the perpetrator of the offense. Contrary to the majority and concurring opinions, this evidence did not just "d[o] little more than connect dots that were all too readily apparent," majority opinion at ¶ 64, nor did it merely "close the loop on the state's case," concurring opinion at ¶ 79. The evidence established a direct link between Boaston and Brandi's murder. Furthermore, because Dr. Scala-Barnett was a medical doctor and an expert with over thirty years of experience, it would have been reasonable for the jury to assign great weight to her testimony. *See Harris* at ¶ 39. Consequently, it is reasonable to conclude that the improperly admitted testimony impacted the jury's verdict and was not harmless beyond a reasonable doubt. *Id.*

{¶ 85} Without Dr. Scala-Barnett's time-of-death and glove-buckle testimony, it cannot be said with any confidence that the jury would have found

that the remaining evidence established Boaston's guilt beyond a reasonable doubt. At trial, the state introduced virtually no physical evidence directly connecting Boaston to the crime. Brandi's body was found with dried blood on her face, neck, and fingernails. Dr. Scala-Barnett testified that lacerations to Brandi's tongue and lip were likely caused by Brandi biting down while struggling to free herself from her assailant. However, investigators did not find any traces of Brandi's blood at Boaston's residence when they searched his home within hours of discovering the body. Nor did investigators discover any signs of a struggle or recent cleaning. Furthermore, although DNA was found on the plastic tarp covering Brandi's body, this DNA did not match Boaston's. And, while the state introduced evidence of scratches on Boaston's face and neck, his DNA was not found on fingernail clippings taken from Brandi's body, nor was his DNA present on swabs taken from Brandi's left hand and right thumb. Likewise, despite Dr. Scala-Barnett's opinion testimony that the abrasion on Brandi's chin was consistent with the pattern and shape of the Velcro and buckle on Boaston's glove, the glove buckle tested negative for Brandi's DNA.

{¶ 86} Although it is true that Brandi's hair was found on or near the Velcro strap of the glove-buckle, this is unremarkable considering how often Boaston and Brandi were together in the days and weeks leading up to her death and that human hair easily catches on and adheres to Velcro.[5] And although DNA found on the back of Brandi's pant legs contained genetic material matching the Boaston-male

---

5. The majority opinion states that "a lot" of Brandi's hair was embedded in the glove buckle. Majority opinion at ¶ 32. But the state presented confusing and potentially conflicting testimony on this point. According to the testimony of one investigator, a single blonde hair was found on the glove. This testimony is consistent with the photograph of the glove introduced at trial. However, testimony from another witness stated that there were approximately 15 hairs embedded in the Velcro of the glove and that some of the hairs had roots on them, which indicated that they were forcefully removed.

profile[6] it also contained at least one other unidentified male profile. The fact that Brandi might have Boaston's DNA on her clothing is also not usual given that she spent prolonged periods of time in his company and at his home. Accordingly, without the deputy coroner's opinion testimony regarding the glove buckle, there would have been no appreciable physical evidence connecting Boaston to the crime.

{¶ 87} In addition to the lack of physical evidence, the state's case did not explain how Boaston managed to get back home after allegedly leaving Brandi's car—with her body inside—alongside a rural road in Fulton County 20 miles from his home. The state was unable to identify any coconspirators or accomplices despite having access to all of Boaston's cell-phone records and home-phone records. Further, Boaston's cell-phone records did not place him in Fulton County during the time frame in which the state argued that Brandi's body was transported to its eventual destination. Indeed, the best the state could do with the cell-phone evidence was to hypothesize that Boaston must have turned off his cell phone sometime around 10:41 a.m., just after the phone registered to Tower 17, the cell-phone tower nearest to his home. The state further speculated that Boaston then drove Brandi's car and transported her body 20 miles to the country location, hitched a ride back to Toledo with an unidentified person, and then turned his cell phone back on when he was almost home. All of this would have needed to happen before 11:36 a.m., when Boaston's cell phone again transmitted a signal to Tower 17 upon receiving a call from his son. While it may not have been impossible for Boaston to do all of this in less than an hour, there was no evidence that actually corroborated the state's version of events.

---

6. The type of DNA testing performed on Brandi's clothing was designed to capture the Y chromosome, so that any male DNA could easily be distinguished from Brandi's own DNA. Because the Y chromosome is passed from father to son, however, Boaston's sons could not be excluded as a potential source of the DNA containing the Boaston-male profile.

**{¶ 88}** The majority's analysis says nothing about the weaknesses in the state's case. Rather, the majority focuses on evidence of Boaston's jealous and controlling behavior, majority opinion at ¶ 66, and what it construes as "Boaston's actions taken in preparation of Brandi's murder," *id*. at ¶ 67, to justify its harmless-error finding. But the court cannot simply cherry pick which evidence it wishes to review when conducting a harmless-error analysis. Harmless-error review requires the court to look at all the evidence that remains after the improperly admitted evidence is removed before determining whether that remaining evidence proves the defendant's guilt beyond a reasonable doubt. *See Harris*, 142 Ohio St.3d 211, 2015-Ohio-166, 28 N.E.3d 1256, ¶ 37.

**{¶ 89}** In this case, the state did present a substantial amount of evidence concerning Boaston's jealous and controlling behavior toward Brandi. From this, the jury might have drawn the inference that Boaston became motivated to kill Brandi once he realized that she intended to leave their relationship and potentially start a new one with someone else. However, it goes without saying that there is a difference between having a motive to kill and actually killing. This evidence of Boaston's controlling behavior, which included psychological and physical abuse, heavily focused suspicion on Boaston. But such evidence is not enough, in and of itself, to establish guilt beyond a reasonable doubt. It also is not enough even when combined with the evidence of (1) Boaston's ATM withdrawals, (2) his purchase of gas for Brandi's car, (3) Boaston's comment to Mark Reno about "tak[ing] care of some business," and (4) his early-morning phone call to Brandi on the day of her death to see if she was coming over. Majority opinion at ¶ 19, 22. Indeed, if these actions are remarkable at all, it is only because they fit the state's theory of the case, not because they are strong evidence of Boaston's guilt.

**{¶ 90}** In contrast, the time-of-death and glove-buckle testimony was strong evidence of Boaston's guilt. At a minimum, the testimony amounted to highly credible evidence compelling the conclusion that at the time Brandi was killed, she

was alone with Boaston at his residence and that Boaston's gloves were used in her strangulation. Although the impact of this evidence appears to be lost on the majority, it was not lost on the state during Boaston's trial.

{¶ 91} From the outset, the state fought to ensure that Dr. Scala-Barnett's testimony could be admitted at trial despite its acknowledgment that it had not followed Crim.R. 16(K)'s requirement that an expert report contain all expert opinions that would be testified to at trial. Had the prosecution believed that this evidence was unimportant in proving Boaston's guilt, it should have had no problem with the exclusion of the testimony in light of its failure to comply with Crim.R. 16(K).

{¶ 92} Furthermore, during its closing argument, the prosecution drew specific attention to the deputy coroner's time-of-death testimony by calling it "important" and further asserting that it

> puts the timeframe on there for us. So if [Brandi] ate that sausage McMuffin at 7:30 or 7:45 in the morning, her time of death is either at 8:45 or 9:45 in the morning, which would place her, by everybody's account, at 1126 Amanda Circle, alone with the Defendant.

{¶ 93} As for the abrasions under Brandi's chin, the prosecution argued:

> [Dr. Scala-Barnett] also testified about the unusual marks on [Brandi's] neck. She said she actually put plastic over [Brandi's] face when she did this because she didn't want the gloves to directly touch the skin there. But she took photographs of the whole thing and she said, oh, it's such an unusual mark on there. You'll see it, the photographs are back there with you, the gloves are back in

evidence also with you, and she said that the buckle—and she placed it up there, she showed you the photograph then, that, in her opinion, that mark on the neck is consistent with the buckle of the Thinsulate gloves. Those same Thinsulate gloves that had the victim's hair in it on the buckle and by the velcro. * * * And she says that [the] homicide occurred before [Brandi] left Amanda Circle, placing this homicide in Lucas County, Ohio. * * * But look at the photographs, examine the gloves, look at the DNA report about the hair. *I submit to you that those items tie this Defendant to this homicide and no one else.*

(Emphasis added.)

{¶ 94} After reviewing the evidence in the record and the state's own statements at trial, it is abundantly clear that Dr. Scala-Barnett's time-of-death and glove-buckle testimony played a central role in the state's case against Boaston. In fact, this evidence may well have been sufficient on its own to establish Boaston's guilt. It was highly credible based on Dr. Scala-Barnett's experience and qualifications and was no doubt at the forefront of the jurors' minds when they left the courtroom to deliberate. It simply cannot be said that the testimony had no impact on the jury's verdict and that its erroneous admission was harmless beyond a reasonable doubt. Further, the remaining evidence does not establish Boaston's guilt beyond a reasonable doubt. What can be said, however, is that the improperly admitted evidence was highly incriminating and persuasive, and it likely overshadowed any remaining circumstantial evidence that the state produced when viewing its case as a whole. Accordingly, I would reverse the judgment of the appellate court and remand for a new trial.

———————————

Julia R. Bates, Lucas County Prosecuting Attorney, and Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Stephen P. Hanudel, for appellant.

James A. Anzelmo, urging reversal for amicus curiae Ohio Association of Criminal Defense Lawyers.

_____