[Cite as *State v. Bellamy*, 2021-Ohio-40.]

COURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT


| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | Hon. W. Scott Gwin, P.J. |
| Plaintiff-Appellee | : | Hon. Craig R. Baldwin, J. |
| | : | Hon. Earle E. Wise, Jr., J. |
| -vs- | : | |
| | : | |
| ERIC BELLAMY | : | Case No. 19 CAA 08 0048 |
| | : | |
| Defendant-Appellant | : | O P I N I O N |


CHARACTER OF PROCEEDING:          Appeal from the Court of Common
                                 Pleas, Case No. 19 CRI 010063


JUDGMENT:                        Vacated and remanded


DATE OF JUDGMENT:                January 8, 2021


APPEARANCES:

For Plaintiff-Appellee                    For Defendant-Appellant

HAWKEN FLANAGAN                           APRIL F. CAMPBELL
145 North Union Street                    545 Metro Place South
3rd Floor                                 Suite 100

Delaware, OH  43015                                    Dublin, OH  43017

*Wise, Earle, J.*

{¶ 1}   Defendant-Appellant Eric Bellamy appeals the August 2, 2019 judgment of conviction and sentence of the Delaware County Court of Common Pleas memorializing his convictions for six counts of rape, three counts of gross sexual imposition, and one count of menacing by stalking. Plaintiff-Appellee is the state of Ohio.

FACTS AND PROCEDURAL HISTORY

{¶ 2}   LaDawn Knight and Eric Bellamy met in 2008, married shortly thereafter, and divorced a year later. During their marriage, they first lived in Cardington Ohio and then Ashley Ohio. Knight's 4 children also resided with the couple including N.S. who was six and seven years-old during the marriage. Bellamy did not work at the time and was frequently home with the children while Knight worked.

{¶ 3}   On Thanksgiving 2018, Knight was using N.S.'s cell phone to perform a Google search. As she entered her search, N.S.'s search history appeared and Knight noticed Bellamy's name in the search history. Knight asked why N.S. was looking for information on Bellamy. N.S. stated she wanted to know if Bellamy was living with other little girls and if he was doing the same things to them that he had done to her. Asked what Bellamy had done, N.S. stated Bellamy had done "everything" to her. Concerned "everything" had a sexual connotation, Knight called police.

{¶ 4}   An officer arrived at the house and advised Knight to take N.S. to the children's advocacy center (CAC) located at Nationwide Children's Hospital. Knight was further advised to refrain from discussing the matter with N.S.

{¶ 5}   At the CAC, N.S. was interviewed by Kerri Wilkinson, a forensic interviewer. The interview was preserved on video.

{¶ 6}   During the interview N.S. explained she and her younger siblings had lived in two different homes with Bellamy. At the first home in Cardington, N.S. explained Bellamy began by exposing his genitals to her and then progressed to making her put her hand on his bare penis, or occasionally on his penis but over his clothing.

{¶ 7}   When the family moved to Ashley, N.S. stated Knight continued to work and Bellamy continued to stay home. Bellamy frequently prevented N.S. from going to a babysitter with her siblings and on one occasion tried to prevent her from going to her father's home for the weekend. He would make the excuse she was in trouble and needed to stay home as punishment. He also chose her clothing, usually tank tops and skirts with no underwear.

{¶ 8}   Also during the interview, N.S. explained that it was in the Ashley house that Bellamy first "tried" to rape her. When it happened, she screamed because it hurt and he stopped because her siblings were at home. Another time when he "actually raped" her, Bellamy took off his clothing, forced N.S. to disrobe, then wanted to "cuddle." N.S. resisted, trying to pull away but Bellamy pulled her back, smacked her face, put his hand over her mouth, and vaginally raped her.

{¶ 9}   N.S. further described an instance of anal rape which took place in a "blanket fort" which Bellamy had constructed in the living room. N.S. stated she bled after this particular attack.

{¶ 10} N.S. further described numerous instances wherein Bellamy would force her to perform fellatio and instances when he performed cunnilingus on her. She stated these activities happened nearly every day during summer of 2009.

{¶ 11} Based on N.S.'s disclosure at the CAC, in January 2019, the Delaware County Grand Jury returned an indictment charging Bellamy with six counts of rape; two counts for vaginal rape, one for anal rape, one for cunnilingus, one for fellatio and one for digital penetration. Each count also alleged the victim was less than 10 years of age, and the acts were committed by force or threat of force. Bellamy was further charged with three counts of gross sexual imposition and one count of menacing by stalking. Bellamy entered pleas of not guilty and elected to proceed to a jury trial.

{¶ 12} Before trial, in April, 2019, the state provided supplemental discovery which included the curriculum vitae of Dr. Stuart Bassman, but did not include a report from Bassman. Although counsel for Bellamy requested a continuance on May 15, 2019 to hire an expert based on the state's supplemental discovery, a defense expert was never hired. Five days before trial, the state provided Bassman's expert report to the defense.

{¶ 13} Bellamy's trial began on July 23, 2019. Before the start of trial counsel for Bellamy made a motion in limine stating that while he had not filed any motion to suppress Bassman's testimony, there may be objections to his testimony depending on what opinions the state sought to elicit. Counsel noted Bassman never met with N.S. and it appeared he would be testifying generically as to what a victim of sexual abuse might experience if indeed they were a victim. Counsel argued it was the jury's role to determine if N.S. was a victim. Transcript of Trial (T.) 10-11. The trial court noted the motion and indicated it would rule on objections as they arose. T. 11.

{¶ 14} Knight, Wilkinson, a Delaware County Sheriff's Deputy and N.S. were the first four witnesses to testify for the state. The video of N.S.'s CAC forensic interview was played for the jury in its entirety during Wilkinson's testimony.

{¶ 15} The state called Bassman as its last witness on the final day of trial. Before his testimony, counsel for Bellamy moved to exclude the testimony of the doctor pursuant to the state's violation of Crim.R. 16(K) which requires the state to provide the report of an expert witness 21 days before trial. Counsel for Bellamy again argued the state failed to provide the doctor's report until five days before trial.

{¶ 16} The state acknowledged its violation of Crim.R. 16(K) and gave no explanation for its failure to provide the report to the defense. The state nonetheless complained that the timing of counsel's motion put the state in "a difficult spot" as it planned to call Bassman as its next witness, and stated Bassman had been listed as a potential witness for the state during discovery months prior. The state further argued that Bassman's testimony was "general in nature," that he never met with N.S. and that the purpose of his testimony was to educate the jury "with his experience in this field."  The trial court ruled it was willing to let the doctor testify, but gave defense counsel time to talk to Bassman before his testimony. T. 410-414.

{¶ 17} During his testimony, Bassman explained delayed disclosure, what makes a victim's story credible, and the grooming behaviors of offenders. He further explained it was important for him to testify because "offenders don't touch * * *[t]hey molest; they offend; they violate; they assault * * * it's not a touch; it's an assault." T. 428-433.

{¶ 18} Bellamy testified in his own defense, called two character witnesses, and N.S.'s boyfriend C.M.

{¶ 19} During its closing argument the state highlighted how important Bassman's testimony was to its case because it showed N.S.'s story was consistent with being the victim of sexual abuse and that Bellamy's behavior was completely consistent with being an abuser. T. 568-569.

{¶ 20} Bellamy was found guilty as charged and sentenced to an aggregate prison term of 28 years to life.

{¶ 21} Bellamy timely filed an appeal and the matter is now before us for consideration. He raises four assignments of error as follow:

I

{¶ 22} "THE TRIAL COURT ERRED IN ALLOWING THE STATE'S EXPERT WITNESS TO TESTIFY DESPITE THE STATE'S FAILING TO SHOW GOOD CAUSE UNDER CRIM.R. 16(K), WITH PREJUDICE TO BELLAMY SUCH THAT IT WAS NOT HARMLESS."

II

{¶ 23} "THE STATE VIOLATED BELLAMY'S DUE PROCESS RIGHT TO A FAIR TRIAL THROUGH PROSECUTORIAL MISCONDUCT, WHICH PREJUDICIALLY AFFECTED HIM IN A MANNER THAT REQUIRES REVERSAL."

III

{¶ 24} "BECAUSE THE EVIDENCE WEIGHED MANIFESTLY AGAINST CONVICTING BELLAMY, REVERSAL OF HIS CONVICTIONS IS REQUIRED."

IV

{¶ 25} "BELLAMY WAS DENIED HIS RIGHT TO A FAIR TRIAL IN THIS CAUSE BECAUSE OF CUMULATIVE ERROR."

I

{¶ 26} In his first assignment of error, Bellamy argues the trial court erred in allowing Dr. Bassman to testify despite the state's failure to show good cause under Crim.R. 16(K) for failing to timely provide the defense with Bassman's report. We agree.

CRIM.R. 16 HISTORY

{¶ 27}  Crim.R. 16(K) provides:

An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications. The written report and summary of qualifications shall be subject to disclosure under this rule no later than twenty-one days prior to trial, which period may be modified by the court for good cause shown, which does not prejudice any other party. Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial.

{¶ 28} In 2010, amendments were made to Crim.R. 16, including the enactment of Crim.R. 16(K). This section required for the first time that experts generate written reports and that those reports be disclosed to the opposing party 21 days before trial. "The purpose of Crim.R. 16(K) is to avoid unfair surprise by providing notice to the defense and allowing the defense an opportunity to challenge the expert's findings, analysis, or qualifications, possibly with the support of an adverse expert who could discredit the

opinion after carefully reviewing the written report." (Internal citations and quotations omitted.) *State v. Buck*, 2017-Ohio-273, 81 N.E.3d 895, ¶ 33 (9th Dist.).

{¶ 29} When a party fails to abide by the requirement of Crim.R. 16(K) to provide the report, the section imposes a consequence: "Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial."

{¶ 30} Before the 2010 amendments to the rule, discretion was granted to the trial court under Crim.R. 16(E)(3) to remedy a failure to comply with discovery requirements. That section provided: "the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances."

{¶ 31} Under amendments to the rule, the trial court still maintains some discretion to sanction discovery violations, which is recognized under Crim.R. 16(L)(1). But that discretion cannot be inconsistent with Crim.R. 16. Crim.R. 16(L)(1) provides:

> The trial court may make orders regulating discovery not inconsistent with this rule. If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances.

{¶ 32} Before the Supreme Court of Ohio's recent decision in *State v. Boaston*, 160 Ohio St.3d 46, 2020-Ohio-1061, 153 N.E.3d 44, some courts relied upon the language of Crim.R. 16(L)(1) to find that even following amendments to Crim.R. 16, the trial court maintained broad discretion to regulate the admission of all evidence.  See e.g. *State v. Proby*, 10th Dist. Franklin No. 2015-Ohio-3364 at ¶ 33. The *Boaston* court, in resolving a split between appellate districts, rejected that reasoning and found Crim.R. 16(K) limited the trial court's discretion in regard to the report of an expert, and provided a specific remedy for violation of the rule. *Boaston* ¶ 54. The court stated:

> The plain language of Crim.R. 16(K) expressly provides the consequence for failing to disclose an expert's report as required: "Failure to disclose the written report to opposing counsel *shall preclude* the expert's testimony at trial." (Emphasis [original].) Crim.R. 16(L)(1) implicitly acknowledges this remedy: "The trial court may make orders regulating discovery *not inconsistent with this rule*." (Emphasis [original].) And while Crim.R. 16(K) confers some measure of discretion on trial judges, it is limited to modifying the 21-day requirement "for good cause shown, which does not prejudice any other party."

{¶ 33} *Boaston* at ¶ 55.

{¶ 34} The argument in *Boaston* concerned a supplement to a coroner's report. The state in that matter had failed to disclose the supplemental report within the time constraints of Crim.R. 16(K).The supplemental report included the coroner's time-of-death opinion and an opinion as to a distinctly shaped abrasion on the deceased victim's chin which was consistent with a glove belonging to Boaston. Defense counsel met with the coroner 19 days before trial, discovered this information and then suggested the state needed to supply the defense the supplement to the coroner's report. The state never did. *Boaston* ¶40-41.

{¶ 35} After finding that this circumstance was a violation of Crim.R. 16(K) by the state, the *Boaston* court then found the matter does not end there, but rather requires a harmless error analysis. Crim.R. 52(A) defines harmless error in the context of criminal cases and provides: "Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." A harmless-error inquiry requires the state to prove the error did not affect the substantial rights of the defendant. *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 15. The *Boaston* court then set forth its three-part analysis:

> First, it must be determined whether the defendant was prejudiced by the error, i.e., whether the error had an impact on the verdict. [*State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153] at ¶ 25 and 27. Second, it must be determined whether the error was not harmless beyond a reasonable doubt. *Id.* at ¶ 28. Lastly, once the prejudicial evidence is excised, the remaining

evidence is weighed to determine whether it establishes the defendant's guilt beyond a reasonable doubt. *Id.* at ¶ 29, 33.

{¶ 36} *Boaston* ¶ 63 citing *State v. Harris*, 142 Ohio St.3d 211, 2015-Ohio-166, 28 N.E.3d 1256, ¶ 37.

{¶ 37} After applying this test, the court found:

Applying that analysis here, we first fail to see how Boaston was prejudiced by the admission of this evidence. The time-of-death opinion was not essential to the state's prosecution of the charged crimes. * * * The deputy coroner's time-of-death opinion merely corroborated the precise time frame that Boaston's own statement and relevant cell-phone records already established. Likewise, Dr. Scala-Barnett's glove-buckle testimony did little more than connect dots that were all too readily apparent. Thus, we do not find that Boaston was truly prejudiced by the admission of this evidence.

{¶ 38} *Boaston*, ¶ 64.

{¶ 39} The court further found, that even without the information contained in the supplemental report, "[T]he remaining evidence adduced by the state established his guilt beyond any reasonable doubt. Therefore, Boaston is not entitled to a new trial." *Boaston* ¶ 70.

APPLICATION OF CRIM.R. 16(K) AND HARMLESS ERROR TO THIS MATTER

{¶ 40} Unlike *Boaston*, were the state failed to timely disclose a supplemental report containing information which was not central to the state's case, here the state failed to disclose any report at all on a matter absolutely central to its case – the credibility of N.S.

{¶ 41} The state does not dispute it failed to provide Bassman's report to the defense until five days before trial. Instead, the state argues its conduct was not willful, and that defense counsel was provided with Bassman's name and curriculum vitae months before trial. But nothing in Crim.R. 16(K) states these things relieve the state of its obligation to provide an expert's report at least 21 days before trial. Even so, the state argues appellant suffered no prejudice because counsel for appellant was granted a continuance at the time Bassman's name and curriculum vitae was disclosed and could have hired an expert but chose not to.

{¶ 42} While it is accurate the state provided Bassman's name and curriculum vitae in discovery (defendant's exhibit 3), no mention was made in these documents as to what type of testimony the state intended to elicit from Bassman or what opinions if any he had formed in the matter. Without this information, counsel for appellant could not know what type of expert he would need to hire and prepare because he did not know that Bassman would be discussing delayed disclosure by sex abuse victims and grooming behaviors by sex offenders until he received Bassman's report (state's exhibit 6) five days before trial. Before Bassman's trial testimony, counsel argued had he known, he could have hired a doctor to refute Bassman's testimony, or at minimum consulted an expert to aid his understanding of Bassman's proposed testimony. T. 413-414.

{¶ 43} Unlike the situation in *Boaston* where there was an abundance of evidence to support Boaston's convictions without the undisclosed report, the case sub judice hinged entirely on the credibility of N.S. There was no forensic evidence, and no testimony from anyone who may have seen or heard anything of the events alleged to have taken place 10 years before N.S. disclosed. There was no testimony from any doctor or nurse from the CAC who may have examined N.S. following her interview, and Bellamy made no incriminating statements.

{¶ 44} Bassman's testimony here was therefore vital to the state's case. Without it the jury may have questioned N.S.'s failure to disclose for ten years. The testimony was used by the state to bolster the credibility of N.S., explain away her delayed disclosure, and further, to cast appellant into the mold of sex offender. T. 426-451. We therefore find appellant was prejudiced by the state's failure to comply with Crim.R. 16(K), the state did not show good cause for failing to timely disclose the report, and the error in admitting the evidence was not harmless beyond a reasonable doubt.

{¶ 45} If we excise Bassman's testimony, as already mentioned above, the case rests entirely on the testimony of N.S. and her forensic interview. After a thorough review of the record, we cannot say the remaining evidence establishes Bellamy's guilt beyond a reasonable doubt.

{¶ 46} In factually similar cases, wherein a doctor's report was not timely provided and the case otherwise rests solely upon the testimony of the victim, other courts have found failure to comply with Crim.R. 16(K) warrants reversal. See, e.g., *State v. McGhee*, 11th Dist. Trumbull No. 2014-T-0106, 2017-Ohio-5773; *State v. Walls*, 2018-Ohio-329,

104 N.E.3d 280 (6th Dist.). We must reach the same conclusion here. The first assignment of error is sustained.

## II, III, IV

{¶ 47} Given our resolution of the first assignment of error, Bellamy's remaining assignments of error are moot.

{¶ 48} The judgment of the Delaware County Court of Common Pleas is vacated. This matter is remanded to the trial court for a new trial without the testimony of Dr. Bassman.

{¶ 49} The judgment of the Delaware County Court of Common Pleas is vacated, and the matter is remanded for proceedings consistent with this opinion.

By Wise, Earle, J.

Gwin, P.J. and

Baldwin, J. concur.

EEW/rw