[Cite as *State v. Blue*, 2021-Ohio-1703.]

COURT OF APPEALS
TUSCARAWAS COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | |
| | : | Hon. Craig R. Baldwin, P.J. |
| Plaintiff-Appellee | : | Hon. John W. Wise, J. |
| | : | Hon. Patricia A. Delaney, J. |
| -vs- | : | |
| | : | Case No. 2020AP080015 |
| | : | |
| TIMOTHY M. BLUE | : | |
| | : | |
| | : | |
| Defendant-Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING:     Appeal from the Tuscarawas County
                             Court of Common Pleas, Case No.
                             2019CR050158


JUDGMENT:                    AFFIRMED


DATE OF JUDGMENT ENTRY:      May 17, 2021


APPEARANCES:

For Plaintiff-Appellee:              For Defendant-Appellant:

RYAN STYER                           LINDSEY K. DONEHUE-ANGLER
TUSCARAWAS CO. PROSECUTOR            217 N. 8th Street
R. SCOTT DEEDRICK                    Cambridge, OH 43725
125 East High Ave.
New Philadelphia, OH 44663

*Delaney, J.*

{¶1}   Appellant Timothy M. Blue appeals from the July 21, 2020 Judgment Entry of the Tuscarawas County Court of Common Pleas.  Appellee is the state of Ohio.

**FACTS AND PROCEDURAL HISTORY**

{¶2}  The following evidence is adduced from the record of appellant's jury trial which commenced on July 14, 2020.

*Jane Doe discloses years of escalating sexual abuse*

{¶3}  This case arose on or around April 14, 2019, when Jane Doe disclosed to her mother ("Mother") that appellant, her biological father, systematically molested and raped her on visitations, beginning when she was seven years old. The sexual assaults were sometimes photographed and videotaped.  Appellant also took nude photos of Doe and photos of Doe engaged in sexual activity.

{¶4}  Doe lives with Mother in a different city and county in Ohio than appellant. At the time of the investigation, appellant lived in a trailer home in New Philadelphia and also rented a single room in a house on Front Street.  Prior to living in New Philadelphia, appellant lived in various places in Mahoning and Trumbull Counties, including Youngstown, Girard, and Hubbard.

{¶5}  Mother and appellant had a brief relationship resulting in Mother's pregnancy with Doe. Doe first met appellant around age two and began voluntary visitation with him around age six. Appellant obtained court-ordered visitation with Doe around age seven. Appellant began molesting Doe almost immediately upon commencement of visitation. Doe's memories of the progressive acts of abuse were associated with the various places where appellant lived and where visitations took place.

{¶6} Doe testified that early court-ordered visitations took place at appellant's grandparents' house in Girard, Ohio. Appellant began touching and molesting Doe during these visits. Doe was frightened by the touching but did not disclose to anyone; she didn't remember if appellant specifically told her not to tell. Appellant's grandparents walked in on appellant molesting her once, but said nothing about the abuse in front of Doe. No one stopped appellant from having visitation.

{¶7} Appellant next moved to Youngstown and the molestation continued, progressing to forced oral sex. Doe was around age nine. Doe testified the molestation and rapes occurred on most visits; appellant would "just tell her to do it;" and appellant climaxed during the abuse. Doe did not recall appellant threatening her to keep the abuse secret; appellant told her he would go to jail and "bad things would happen to him" if anyone found out.

{¶8} Appellant then moved across town in Youngstown, and the touching and oral sex continued.

{¶9} Appellant next moved to a residence in Boardman and lived there alone. Doe was now around ten years old. The abuse progressed to penetrative vaginal intercourse. Doe recalled the first time this happened, and that she was scared. Doe did not disclose the abuse, which continued upon every visitation.

{¶10} Appellant then moved to a different residence in Youngstown, and lived there with someone else. Doe was around ten or eleven years old. The abuse continued with touching, oral, and vaginal sex. Doe testified appellant provided her with alcohol and marijuana during visitations.

{¶11} Appellant then moved in with his father in New Philadelphia. Doe testified this was around 2016-2017, when she was twelve or thirteen years old. The abuse now included touching, oral, vaginal, and anal intercourse. Doe testified the latter hurt and scared her, although she did not disclose the abuse and visitation continued. She recalled appellant telling her that he would go to jail if she told anyone.

{¶12} Appellant then moved into a house trailer in New Philadelphia with a woman named Kayla. Doe testified the abuse continued "occasionally" at the trailer while she was around age fourteen.

{¶13} Finally, appellant obtained a room in a rundown house on Front Street in New Philadelphia, although his residence ostensibly remained Kayla's trailer. Appellant's "room" is the house's living room, walled off with blankets for privacy. It contains a bed and a chest of drawers. The house is owned by Ed Hall, who lives in the basement. Other people come and go from the house occasionally.

{¶14} During recent visitations, Doe stayed with appellant in the room on Front Street. This location is where the abuse became more "aggressive," as Doe described it. During sex acts, appellant tied Doe up, choked her, and hit her with a wooden spoon, raising welts on her skin. Appellant used what were described at trial as "sexual devices" including a ball gag, ropes, lingerie, a dildo, and a vibrator. Appellant took photos of the abuse and videotaped it. Further, Doe testified people viewed the sex abuse online as it occurred. Doe testified that no one else participated in the abuse.

{¶15} Appellee presented Doe with a number of sexually-explicit photographs and asked her to identify them. The photos were of Doe nude and engaged in sexual acts, sometimes with appellant, whose face was obscured. Doe also identified a video of

appellant having vaginal intercourse with her. Appellee presented Doe with evidence found by police at the Front Street address, including a ball gag, dildo, vibrator, ropes, and lingerie. Doe identified these items as those used during the abuse.

{¶16} Around December 2018, Doe told a friend that she was being abused. She was frightened because the abuse was becoming violent and aggressive and she didn't know what might happen next. She also refused to go to visitation with appellant.

{¶17} Doe disclosed the sexual abuse to her mother on April 14, 2019. At that point, appellant and Mother were engaged in a court battle over visitation. Mother testified that appellant had always been extremely cooperative about visitation, always showing up for visits, arranging extra visits, etc. Several incidents occurred, however, which led Mother to suspect sexual abuse. Doe began to refuse to go with appellant for visitation. In March 2019, appellant showed up at Mother's residence with a police officer, who told Mother she could be cited for contempt if she didn't allow Doe to attend visitation. Doe didn't want to go and Mother refused to make her go, despite the threat of contempt.

{¶18} Escalating tensions, Doe's resistance to visitation, Doe's behavior "acting out" and her increasing psychological problems led Mother to seek counseling for her. Doe was specifically questioned about potential sexual abuse at two different counseling facilities and she denied abuse was occurring. Doe also met with guardian ad litem several times over the course of the parties' custody and visitation litigation and did not disclose the sexual abuse.

{¶19} The day after Doe's disclosure, Mother brought her to the New Philadelphia Police Department. Detective Scott Nelson started an investigation. Doe described the Front Street room to Nelson and told him where he could find pertinent evidence. Nelson

went to the room and photographed it with Ed Hall's permission, then obtained a search warrant. Nelson found a bag containing the "sexual devices" described by Doe and submitted them to the BCI crime lab. A forensic scientist testified DNA consistent with appellant and Doe was found on the dildo, ball gag, and ropes. Nelson also found a "Coolpad" cell phone described by Doe as the device used to take the photos and videos of the abuse. Chief Todd Beeman of the Dennison Police Department used software to extract the contents of the phone after Nelson obtained a search warrant. Doe provided the passcode, which was appellant's birthday. Nelson observed the photos and videos described by Doe.

{¶20} Appellee presented the photos, videotape, "sexual devices," and DNA results as evidence in its case in chief.

*Defense case: Doe didn't disclose and denied abuse in the past*

{¶21} Appellant called two defense witnesses at trial: the guardian ad litem and one of Doe's counselors from a psychiatric facility. Both witnesses testified Doe had opportunities to disclose the sexual abuse to them and did not do so.

*Indictment, trial, conviction and sentence*

{¶22} Appellant was charged by indictment with one count of gross sexual imposition pursuant to R.C. 2907.05(A)(4) and 2907.05(C)(2), a felony of the third degree [Count I]; one count of rape pursuant to R.C. 2907.02(A)(1)(b) and 2907.02(B), a felony of the first degree [Count II]; one count of sexual battery pursuant to R.C. 2907.03(A)(5) and 2907.03(B), a felony of the third degree [Count III]; one count of pandering obscenity involving a minor pursuant to R.C. 2907.321(A)(1) and 2907.321(C), a felony of the second degree [Count IV]; one count of pandering obscenity involving a minor pursuant

to R.C. 2907.321(A)(5) and 2907.321(C), a felony of the fourth degree [Count V]; one count of pandering sexually-oriented matter involving a minor pursuant to R.C. 2907.322(A)(1) and 2907.322(C), a felony of the second degree [Count VI]; and one count of pandering sexually-oriented matter involving a minor pursuant to R.C. 2907.322(A)(5) and 2907.322(C), a felony of the fourth degree [Count VII].

{¶23} Appellant entered pleas of not guilty and filed a number of pretrial motions which are not relevant to the issues in the instant appeal. Appellee also filed several motions in limine.

*Proposed testimony of Dr. Robin Tener regarding nondisclosure by child victims of sexual abuse*

{¶24} Relevant to the instant appeal, on July 1, 2020, appellant filed a Motion to Exclude proposed expert testimony of Dr. Robin Tener on the basis of Crim.R. 16(K) because appellee did not provide a written report from the expert within 21 days of trial. Appellant also argued that pursuant to Evid.R. 702, there is no information Dr. Tener could provide beyond the scope of a layperson because she did not interview the alleged victim or otherwise play any role in the case.

{¶25} On July 8, 2020, appellee responded with a memorandum in opposition, noting defense trial counsel was notified on December 18, 2019 that Dr. Tener would be called as an expert witness for appellee at trial and provided with Dr. Tener's detailed C.V. On June 17, 2019, 28 days before trial, appellee provided counsel with a "Supplemental Response to Request for Discovery" containing, e.g., a letter from Dr. Tener, appellee's expert witness. Tener's letter is attached to appellee's memorandum and states in pertinent part:

\* \* \* \*.

Regarding the scope of my testimony, I expect to discuss a number of issues pertinent to this case, including, but not limited to, the following topics: (1) Delayed disclosure of sexual abuse by child victims and the wide variety of circumstances that contribute to a victim's denial of abuse. (2) Young children's perceptions of adult offender behavior when the offender is a trusted adult. (3) The manner in which the relationship between a victim and an offender can manipulate a child's recognition of the wrongful nature of sexual contact between a child and a trusted adult. (4) Family dynamics that can contribute to confusion regarding family member roles, parent-child loyalty conflicts and distorted parent-child relationships. (5) The way in which issues 2-4 may impact a child's ability/willingness to provide a disclosure, versus deny that abuse is occurring when it actually is.

* * * *.

{¶26} Upon receipt of appellant's motion to exclude Tener's testimony, appellee also offered a telephone conference with Tener to discuss her expected testimony. Appellee therefore argued that an "expert report" within the meaning of Crim.R. 16(K) had been provided.

{¶27} On July 9, 2020, appellant filed a second "Memorandum Contra Testimony of Potential Expert Witness" arguing that Tener's letter cited supra is not an expert report pursuant to Crim.R. 16(K) and even if it is, testimony outside of the topics mentioned in the letter are prohibited by *State v. Boaston*, 160 Ohio St.3d 46, 2020-Ohio-1061, 153

N.E.3d 44, reconsideration denied*,* 159 Ohio St.3d 1438, 2020-Ohio-3634, 148 N.E.3d 586.

{¶28} The trial court overruled appellant's motion to exclude Tener's testimony on July 14, 2020.

{¶29} The matter proceeded to trial by jury.

*Dr. Tener's testimony at trial*

{¶30} Appellee presented, e.g., the testimony of Dr. Tener over appellant's continuing objection. Tener testified as an expert witness, specifically, a clinical psychologist specializing in children, adolescents, and families. She has received specific training in treatment of minor victims of sexual abuse, a field that has evolved over the length of her career. Tener was not compensated for her testimony but was paid for her time out of her office.

{¶31} In the instant case, Tener testified she never met Doe personally; she was not the assessing clinician, did not write a report specific to Doe's issues, and did not review any records pertinent to Doe. She was aware of Doe's age, her relationship with appellant, the failure to disclose over many years, and the denials of abuse followed by a disclosure of abuse. She had no contact with Doe and appellee did not request specific conclusions or opinions so that Tener could strictly limit her testimony to general educational commentary about children and sexual abuse.

{¶32} Tener testified it is not unusual for a child to fail to disclose sexual abuse. Depending upon the child's age, he or she may not recognize the sexual activity as "abuse." Typically, offenders have a relationship with the victim and do not frighten or distress the child victim in an extreme way. Children do not have "body boundaries" with

adults, making it easy for an offender to acclimate a young child to touching which progressively becomes more serious. Upsetting the child is not in the offender's best interest, and to secure secrecy, the offender will typically start at a relatively "low level" of abuse.

{¶33} As the child becomes older, the offender has a stronger need for secrecy; the offender may tell the child to keep the abuse secret, or lead the child to believe the acts are part of the child's "special relationship" with the offender which no one else would understand. The offender may tell the child that something bad will happen to the offender if the child tells anyone.

{¶34} Tener pointed out that if the abuser is a parent or other close relative, there is an additional dynamic to consider because the child's relationship with that person is not entirely abusive; there are positive aspects of a "normal" relationship as well, which the child wants to preserve. As the child grows older, he or she will recognize that the abusive acts are wrong, but once the child is capable of recognizing that the abuse shouldn't be happening, the child may have been involved in touching the perpetrator. The child feels culpable now and doesn't realize they're being manipulated by the adult offender.

{¶35} Tener testified that children have a lot of fear surrounding abusive relationships, and the fear is not necessarily premised upon explicit threats. Most offenders don't have to resort to threats because they can manipulate their relationship with the victim, providing advantages such as gifts and privileges. Children also realize they don't want to lose the relationship with the offender or the offender's extended family, and realize disclosure means the likely loss of those relationships.

{¶36} Reasons for failure to disclose become more complex and layered as the victim grows older. Older children worry how they will be viewed by their peers and perceive a social cost to disclosure. The child realizes the abuse is inappropriate but the relationship with the offender has grown and the child feels loyalty to the offender. Older children begin to worry about pregnancy. The abuse may become more deviant over time, leading to confusion and fear on the part of the victim, who may have felt physical pleasure at some point and adds to the victim's worry and hesitation to disclose.

{¶37} Tener testified that child victims are often in a quandary for a long time, afraid for the abuse to continue but conflicted about disclosure and the consequences. The child may feel they are treated as an adult by the offender, almost in a "girlfriend" type of role. The offender might provide alcohol or drugs, and use those as an incentive to maintain the victim's silence. The child does not have the self-awareness to recognize the offender's manipulation.

{¶38} The psychological pressures on the victim can extend to the victim denying abuse is taking place, if questioned directly. The child wants to protect the offender and tolerates the abuse to maintain the relationship.

{¶39} When asked why a child under these circumstances might eventually disclose the abuse, Tener opined that if the abuse has become more serious, or more painful for the victim, or is bizarre in a way that scares them, they might tell. The relationship with the offender might give way to jealousy of friends and the child victim realizes he or she cannot have normal relationships with peers because the offender interferes. The offender will likely be threatened by the victim's other relationships and may become possessive, insinuating himself into the victim's other relationships.

{¶40} Tener explained that upon disclosure, the child may exhibit a range of reactions. The child might be very emotional, or very blank and closed-off. The child might be angry. Sometimes the child's manner during a disclosure depends upon how many times they've told the story of the abuse. The longer the abuse has gone on, and the more acclimated the child is to it, the child may act as though the abusive behavior was a routine part of the relationship.

{¶41} Tener also testified to the psychological ramifications of child sexual abuse. The child has been in a secret, coercive relationship and feels guilty. It is not uncommon for a victim to experience anxiety, stress, and depression, or to have low self-esteem, or resentment and anger over the realization that this doesn't happen to all children. Older children might cut themselves or self-harm, have academic problems and problems with concentration. The minor victim might be sexualized beyond the age of their peer group, and exhibit inappropriate sexual interest and knowledge. The child may be acclimated to being viewed in a sexual way, and might be sexually aggressive with others, as he or she realizes they are now in control of a sexual feeling. Other children become very phobic about sex.

{¶42} Upon cross-examination, Tener testified that it is possible in a high-conflict family for false allegations of sexual abuse to be made, but in her experience, false allegations of sexual abuse are not typical. Red flags for false allegations arise when a child can't provide details of the abuse and tries to fill in details from a child's point of view. If the child has been coached, the story will change and the child won't be able to provide a narrative of how, when, and where the abuse occurred. A child who fabricates abuse is unlikely to keep the story straight over time.

{¶43} Tener also pointed out that if a child has been abused over a long period of time, with many instances of abuse, the child may have difficulty recalling individual events because multiple episodes blend together. It is not uncommon, therefore, for a child victim to be unable to parse specific dates of the abuse.

*Appellant found guilty and Crim.R. 29(A) reconsidered*

{¶44} Appellant made a motion for a judgment of acquittal pursuant to Crim.R. 29(A). The trial court overruled the motion and appellant was found guilty as charged.

{¶45} After trial, the trial court reconsidered its judgment upon the motion for acquittal as to Count I only and reversed its decision, finding appellee failed to prove that the acts charged in Count I occurred in Tuscarawas County, Ohio between the dates alleged. The trial court thereupon imposed an aggregate sentence of an indefinite term of ten years minimum to life in prison upon Counts II through VII. The trial court further found that appellant's convictions upon Counts V, VI and VII were allied offenses which merged with Count IV for purposes of sentencing.

{¶46} Appellant now appeals from the July 21, 2020 judgment entry of convictions and sentence.

{¶47} Appellant raises one assignment of error:

**ASSIGNMENT OF ERROR**

{¶48} "THE TRIAL COURT COMMITTED A FATAL ERROR WHEN IT PERMITTED THE TESTIMONY OF EXPERT WITNESS DR. ROBIN TENER."

**ANALYSIS**

{¶49} Appellant argues his conviction must be overturned and a new trial granted because the trial court permitted the expert testimony of Dr. Robin Tener. We disagree.

{¶50} An appellate court's standard of review on evidentiary and discovery matters is an abuse of discretion. *State v. Kopchak*, 5th Dist. Muskingum No. CT2017-0036, 2018-Ohio-1136, ¶ 15, citing *State v. Elliott*, 5th Dist. Tuscarawas No. 2007AP070044, 2008–Ohio–5673, ¶ 23. An abuse of discretion is more than an error of law and implies that the trial court acted "unreasonably, arbitrarily or unconscionably." *Blackmore v. Blackmore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶51} In 2010, Ohio Crim.R. 16 was amended to include the enactment of Crim.R. 16(K). This section required for the first time that experts generate written reports and that those reports be disclosed to the opposing party 21 days before trial. *State v. Bellamy*, 5th Dist. Delaware No. 19 CAA 08 0048, 2021-Ohio-40, ¶ 28. Ohio Crim. R. 16(K) provides:

> An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications. The written report and summary of qualifications shall be subject to disclosure under this rule no later than twenty-one days prior to trial, which period may be modified by the court for good cause shown, which does not prejudice any other party. Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial.

{¶52} The underlying purpose of Crim.R.16(K) is stated in the Staff Notes as follows: "Failure to comply with the rule precludes the expert witness from testifying during trial. This prevents either party from avoiding pretrial disclosure of the substance of expert

witness's testimony by not requesting a written report from the expert, or not seeking introduction of a report." Crim.R. 16(K) is thus designed to avoid "trial-by-ambush" scenarios. *See State v. Walls,* 2018-Ohio-329, 104 N.E.3d 280, ¶ 39 (6th Dist.) [error to allow doctor's expert testimony when testimony exceeded scope of report]. When the prosecution timely provides a Crim.R. 16(K) report to the defense, undue surprise is eliminated and the defense may challenge the expert's findings, conclusions, or qualifications, and/or obtain their own expert. See, *State v. Hall*, 1st Dist. Hamilton No. C-170699, 2019-Ohio-2985, ¶ 11, appeal not allowed, 157 Ohio St.3d 1485, 2019-Ohio-4600, 134 N.E.3d 204.

{¶53} In the instant case, appellant first argues that the letter provided by Dr. Tener is not a "report" timely provided within the meaning of Crim.R. 16(K). We disagree. First, we find the letter was timely provided to the defense. Tener's letter was attached to appellee's "Memorandum in Opposition to Defendant's Motion in Limine to Exclude Expert" filed July 8, 2019, and appellee maintained the letter was first provided to appellant in the discovery response filed June 17, 2019--28 days before trial.[1]

{¶54} We find the letter was an "expert report" within the meaning of the Rule because it succinctly summarizes Tener's expected testimony and her "findings, analysis, conclusions, or opinion" regarding her knowledge of nondisclosure and denial by victims of childhood sexual abuse. Upon the initial disclosure of Tener's name and qualifications, appellee consistently represented that Tener would testify to generalities only; she did not meet Jane Doe in person or counsel her; she did not read any reports in the case; and

---

[1] Appellant has not argued that appellee failed to timely disclose Dr. Tener's qualifications and the record indicates her C.V. was provided to the defense on December 18, 2019.

knew only Doe's age and relationship to appellant. The trial court ruled that Tener could not offer an opinion concluding why Jane Doe specifically did not disclose in this case. T. July 13, 2020, 55. We find Tener's testimony is entirely consistent with the parameters described in the letter and that Tener did not violate the limitations set by the trial court.

{¶55} The underlying purpose of Crim.R. 16(K) is fully satisfied in this case. The identification of Tener as an expert witness was made six months prior to trial; the scope of her expected testimony was timely provided via the letter; and the parties exhaustively argued about the scope of the potential testimony in advance of trial. Appellant cannot claim to have been ambushed by the limited scope of Tener's testimony.

{¶56} Even if we were to conclude that Tener's letter was not a 16(K) "expert report," other courts "have found that there is adequate compliance with the requirement to produce an expert report where other evidence reflecting the expert's testimony has been provided to the opposing party." *State v. Allenbaugh*, 11th Dist. No. 2019-A-0017, 2020-Ohio-68, 151 N.E.3d 50, ¶ 36, appeal not allowed, 159 Ohio St.3d 1464, 2020-Ohio-3882, 150 N.E.3d 118, citing *State v. Fetty*, 11th Dist. Portage No. 2011-P-0091, 2012-Ohio-6127 [medical records in lieu of expert report adequately provided requesting party with necessary information]; *State v. Rich*, 12th Dist. Butler No. CA2012-03-044, 2013-Ohio-857, 2013 WL 939539, [detective's evidence submission form containing summary of findings and conclusions adequate in lieu of "expert report"]. We conclude that the letter provided to appellant satisfies appellee's obligations to provide an expert report pursuant to Crim.R. 16(K).

{¶57} We are mindful that "common sense should not be ignored when there has been clear compliance with the purpose of Crim.R. 16(K), which is to eliminate unfair

surprise at trial by requiring advance disclosure of an expert's qualifications and opinions so that opposing counsel has sufficient time to prepare for cross-examination, retain a rebuttal expert, and seek court intervention if there is reason to believe that the disclosures are inadequate." *State v. Walls*, 2018-Ohio-329, 104 N.E.3d 280, ¶ 36 (6th Dist). In the instant case, appellee's disclosures regarding Tener's qualifications and expected testimony are adequate.

{¶58} Appellant further argues the trial court's decision to permit Tener's expert testimony violates the Supreme Court of Ohio's decision in *State v. Boaston*, 160 Ohio St.3d 46, 2020-Ohio-1061, 153 N.E.3d 44. The *Boaston* court found Crim.R. 16(K) limits the trial court's discretion regarding expert reports and provides a specific remedy for violation of the rule: exclusion of the expert's testimony. *Boaston,* ¶ 54.

{¶59} We agree with the trial court that *Boaston* has limited application to the instant case. T. July 13, 2020, 53. The issue in *Boaston* arose regarding a supplement to a coroner's report which the state did not disclose within the time constraints of Crim.R. 16(K). The supplemental report was significant because it included the coroner's time-of-death opinion and an opinion that a distinctly-shaped abrasion on the deceased victim's chin was consistent with a glove belonging to Boaston. Defense counsel met with the coroner 19 days before trial, discovered this information, and suggested the state needed to provide the supplemental coroner's report, but the state did not do so. *Boaston,* ¶40-41.

{¶60} Although the Court found the state's failure to provide the supplement violated Crim.R. 16(K), the *Boaston* Court further found that a harmless-error analysis is required. Crim.R. 52(A) provides: "Any error, defect, irregularity, or variance which does

not affect substantial rights shall be disregarded." A harmless-error inquiry requires the state to prove the error did not affect the substantial rights of the defendant. *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 15. The *Boaston* Court set forth a three-part harmless-error analysis:

> First, it must be determined whether the defendant was prejudiced by the error, i.e., whether the error had an impact on the verdict. [*State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153] at ¶ 25 and 27. Second, it must be determined whether the error was not harmless beyond a reasonable doubt. *Id.* at ¶ 28. Lastly, once the prejudicial evidence is excised, the remaining evidence is weighed to determine whether it establishes the defendant's guilt beyond a reasonable doubt. *Id.* at ¶ 29, 33.
>
> *State v. Boaston,* 160 Ohio St.3d 46, 2020-Ohio-1061, 153 N.E.3d 44, ¶ 63.

{¶61} In the instant case, we have found no violation of Crim.R. 16(K). Even if we found the trial court erred in admitting Tener's testimony, however, appellant was not prejudiced by the error; the error was harmless beyond a reasonable doubt; and the remaining evidence established appellant's guilt beyond a reasonable doubt. *Boaston*, supra, ¶ 63.

{¶62} Tener's testimony was not vital to appellee's case. See, *State v. Bellamy*, 5th Dist. Delaware No. 19 CAA 08 0048, 2021-Ohio-40, ¶ 44. Jane Doe explained why she didn't disclose the abuse earlier and why she denied sexual abuse when directly questioned: she was afraid of the potential consequences for appellant. Appellant told

her bad things would happen to him in jail if anyone found out. There was no need to bolster Jane Doe's credibility because of the horrific nature of appellee's documentary evidence: the testimony was corroborated by photos and video of the abuse. Doe's testimony was further corroborated by Detective Nelson, who found the "sexual devices" as described in appellant's rented room where Doe said they would be. Her testimony was further corroborated by the D.N.A. results finding a mixture of her and appellant's D.N.A. on the items.

{¶63} Even if we were to conclude appellee failed to comply with Crim.R. 16(K), appellant was not prejudiced and any error in admitting Tener's testimony was harmless beyond a reasonable doubt. *Bellamy*, supra, 5th Dist. Delaware No. 19 CAA 08 0048, 2021-Ohio-40, ¶ 44. If we excise Tener's testimony, the case does not rest entirely on the testimony of Jane Doe. *Id.,* ¶ 45. After a thorough review of the record, we are convinced the remaining evidence establishes appellant's guilt beyond a reasonable doubt. *Id.*

{¶64} Appellant's sole assignment of error is overruled.

## CONCLUSION

{¶65} Appellant's sole assignment of error is overruled and the judgment of the Tuscarawas County Court of Common Pleas is affirmed.

By: Delaney, J.,

Baldwin, P.J. and

Wise, John, J., concur.