[Cite as *State v. Jemison*, 2025-Ohio-5629.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| v. | : | No. 114844 |
| JERMILL JEMISON, | : | |
| Defendant-Appellant. | : | |

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** December 18, 2025

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-24-695953-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, Dominic Neville and Matthew Moretto, Assistant Prosecuting Attorneys, *for appellee.*

Joseph V. Pagano, *for appellant.*

EILEEN T. GALLAGHER, P.J.:

{¶ 1} Appellant Jermill Jemison ("Jemison") appeals his convictions for domestic violence and endangering children. He raises four assignments of error:

1. The trial court erred when it denied appellant's motion for acquittal under Crim.R. 29 because the State failed to present sufficient evidence

to establish the elements necessary to support the convictions beyond a reasonable doubt.

2. Appellant's convictions are against the manifest weight of the evidence.

3. The trial court abused its discretion by admitting expert testimony and the testimony of other witnesses over appellant's objection and in violation of Crim.R. 16.

4. The court committed plain error by providing improper instructions on the purposes for which the jury could consider the other acts prior conviction evidence which deprived appellant of a fair trial.

{¶ 2} After a thorough review of the applicable law and facts, we find that the trial court did not err in admitting expert and other testimony or in providing the jury instructions. Jemison's convictions were supported by sufficient evidence and not against the manifest weight of the evidence. We overrule the assignments of error and affirm the judgment of the trial court.

## I. Factual and Procedural History

{¶ 3} Jemison was indicted on two counts of strangulation, in violation of R.C. 2903.18(B)(2) and (B)(3), one count of domestic violence, with a prior conviction, in violation of R.C. 2919.25(A), and one count of endangering children, with a prior conviction, in violation of R.C. 2919.22(A).

{¶ 4} A jury trial commenced, and the State presented the testimony of the victim, T.F.; Redmond Dyer ("Dyer"), who worked in the scientific identification unit of the Cuyahoga County Sheriff's Department; Cleveland Police Officer Joseph Fitchwell ("Ofc. Fitchwell"), who responded to the scene; and Cleveland Police Detective Emily McKenzie ("Det. McKenzie"), who investigated the case.

**{¶ 5}** T.F. testified that she had dated Jemison on and off since October 2021. (Tr. 210-211.) The two had a child together, who was a little over three months old at the time of the incident. (Tr. 209 and 213.)

**{¶ 6}** In August 2024, Jemison came to T.F.'s house to visit the baby. (Tr. 213-214.) T.F. acknowledged that it was normal for Jemison to come over and that he was welcome to visit the baby. (Tr. 214.) Jemison was intoxicated that day, and the two exchanged words and got into a physical altercation. (Tr. 214.)

**{¶ 7}** T.F. noticed that Jemison smelled like liquor and did not want him to pick the baby up. (Tr. 216.) She was not happy that he was getting in the way of her bedtime process for the baby. She yelled at him to put the baby down, and he yelled some "degrading" things at her. (Tr. 217.) They were extremely close, face to face, and she pushed him to get out of her face. (Tr. 218.)

**{¶ 8}** Jemison then swung at her; she was able to duck and then swung back at him. (Tr. 219.) He "rush[ed] at her" and as they were tussling, his back hit the closet door, causing it to fall over. (Tr. 222 and 229.) At some point, T.F. stopped the altercation to point out that the baby was on the bed, although they were not near the bed. (Tr. 229 and 266.)

**{¶ 9}** Jemison told her that the baby was fine and then pressed his wrist into T.F.'s throat several times, causing her some difficulty in breathing. (Tr. 222-227 and 229.) At the same time, he continued to hit her. (Tr. 227-228.) Eventually, the fight just stopped, and Jemison ran out of the house, taking T.F.'s cell phone with him. (Tr. 231-232.) Jemison left the scene on foot. (State's exhibit No. 3.)

{¶ 10} T.F. followed him outside. (Tr. 232.) She saw someone that she knew and gave the baby to that person. (*Id.*) Someone called 911, and T.F. was able to speak to the dispatcher on the other person's phone. (Tr. 232-233.) T.F. was very angry about Jemison taking her phone during this call. (Tr. 255, State's exhibit No. 3.) The police drove T.F. to her parents' house, where she gave a brief statement. (Tr. 239.) T.F. stated that she sustained scrapes and bruises from the altercation but did not seek medical treatment. (Tr. 257 and 260.) A detective later came to see T.F., but T.F. was not ready to speak with her at that time. (Tr. 238.) The detective gave T.F. her business card, and the two scheduled an interview for a later date. (Tr. 239.)

{¶ 11} Ofc. Fitchwell testified that on the day in question, he responded to a 911 call for a domestic-violence situation in progress. T.F. was standing on the sidewalk with the baby in a stroller. T.F. stated that her baby's father had just assaulted her and walked off. (Tr. 283 and 290.) Because Jemison was still in the area, she requested that the officers take her to her family's house. (Tr. 283.)

{¶ 12} When asked to describe T.F.'s demeanor after he took her to her family's house, Ofc. Fitchwell stated that T.F. was upset and cried while she detailed what had happened. (Tr. 284.) T.F. had pointed at her knees and stated that she had rug burn. (Tr. 285.)

{¶ 13} On cross-examination, Ofc. Fitchwell testified that he did not photograph any injuries on T.F. and that there were no witnesses to speak to at the

scene. (Tr. 287 and 289.) He spent approximately an hour with the victim, including the time that he drove her to her parents' house. (Tr. 288.)

{¶ 14} Det. McKenzie testified that she was assigned this case the day after the incident. She reviewed the report and Jemison's criminal history. She noted that he had prior convictions for endangering children and another charge in 2021. (Tr. 299.)

{¶ 15} Det. McKenzie testified as to State's exhibit No. 1, which was a journal entry showing that Jemison had pled guilty to endangering children and domestic violence in November 2021. (Tr. 301, State's exhibit No. 1.) She further noted that the fourth page of the exhibit noted the date of the incident as April 17, 2021. (Tr. 302.) Det. McKenzie was asked about State's exhibit No. 2, a fingerprint card from Jemison's 2021 arrest. The arrest date on the card was noted as April 17, 2021. (Tr. 303.)

{¶ 16} Det. McKenzie stated that she went to visit T.F. She said T.F. was "in a bad state," so she just handed her a business card, and T.F. said that she would call. (Tr. 304.) When Det. McKenzie next spoke to T.F., they set up a date for an interview.

{¶ 17} During the interview, T.F. initially stated that she did not want to be in "the court setting," so Det. McKenzie gave her a "no-prosecution" form, which would advise the City of Cleveland's prosecutor's office that T.F. did not want to participate in prosecution. (Tr. 306.) Det. McKenzie stepped out of the room, but when she returned, T.F. was crying and said she was unsure if she wanted to complete the

form. (*Id.*) Ultimately, she did not sign the form. (*Id.*) T.F. identified Jemison as the person who had struck her during the domestic-violence incident. (*Id.*)

{¶ 18} Dyer was presented as an expert witness for the State in order to connect Jemison to his prior convictions for domestic violence and child endangering. During his testimony, Dyer was asked about State's exhibit No. 2, a fingerprint card from Jemison's April 2021 arrest, where he was charged with domestic violence, felonious assault, and endangering children. Dyer then fingerprinted Jemison in real time and returned to the witness stand. The court allowed Dyer some time to examine the fingerprints taken at that time in comparison with the ones reflected on State's exhibit No. 2. Dyer took a second impression of one of Jemison's thumbs in order to examine it further. Dyer then testified that the source of the fingerprints "seem[ed] to be consistent" with the fingerprints that had been taken in connection with Jemison's April 2021 arrest.[1] (Tr. 190.)

{¶ 19} On cross-examination, Dyer described the process of comparing fingerprints and what in particular he checks. He stated that he tries to do at least a dozen points of comparison on the fingerprints. When asked about possibility of error, Dyer stated that it would be more likely that they would erroneously exclude a person rather than include them; he learned in his training that "[i]f you're not so sure, just exclude them." (Tr. 202.)

---

[1] Dyer was asked if the fingerprints were a "match," but he stated that they "don't really like to use the word 'match.'"

{¶ 20} Jemison did not present any witnesses or exhibits.

{¶ 21} The jury found Jemison guilty of the domestic-violence and child-endangering counts; he was acquitted of both counts of strangulation.

{¶ 22} The court sentenced Jemison to six months of incarceration on each charge, to be served concurrently. Jemison then filed the instant appeal.

## II. Law and Analysis

{¶ 23} For ease of discussion, we will address Jemison's assignments of error out of order, beginning with the third.

### A. Admission of Expert and Other Witnesses' Testimony

{¶ 24} In his third assignment of error, Jemison argues that the trial court erred in allowing the State to present the testimony of Dyer because the State had never produced an expert report from him prior to trial. Jemison further contends that the trial court improperly allowed the State to offer a 2021 fingerprint card that had not been produced to the defense.

{¶ 25} There is no dispute that "the collection of fingerprints and the comparison of those prints with known samples is a matter beyond the knowledge or experience possessed by a lay person." *State v. Belton*, 2016-Ohio-1581, ¶ 118, citing *State v. Hartman*, 93 Ohio St.3d 274, 284 (2001) (noting that "expert testimony was necessary to make fingerprint comparisons"). "'A ruling concerning the admission of expert testimony is within the broad discretion of the trial court and will not be disturbed absent an abuse of discretion.'" *State v. Primeau*, 2012-Ohio-5172, ¶ 57 (8th Dist.), quoting *Scott v. Yates*, 71 Ohio St.3d 219, 221 (1994). An

expert witness is one who "possess[es] knowledge in the relevant subject area that is superior to an ordinary person." *Id.* The witness may be "'qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony.'" *Id.*, quoting Evid.R. 702(A) and (B).

{¶ 26} "Courts should favor the admissibility of expert testimony whenever it is relevant and the criteria of Evid.R. 702 are met." *State v. Nemeth*, 82 Ohio St.3d 202, 207 (1998). However, "it is error to admit expert-opinion testimony when the expert's opinion was not set forth in a written report prepared in compliance with Crim.R. 16(K)." *State v. Boaston*, 2020-Ohio-1061, ¶ 1.

{¶ 27} Crim.R. 16(K) provides:

> An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications. The written report and summary of qualifications shall be subject to disclosure under this rule no later than twenty-one days prior to trial, which period may be modified by the court for good cause shown, which does not prejudice any other party. Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial.

{¶ 28} The State acknowledges that no expert report was provided and contends that there was no report to provide because Dyer had not come to any conclusions, findings, or opinions prior to the real-time fingerprinting during the trial. The State provided Dyer's curriculum vitae because that was all that it had to offer prior to Dyer's testimony. The State asserted that it was not aware that it would need an expert witness regarding the prior convictions until the defense declined to stipulate to the prior convictions.

{¶ 29} The Ohio Supreme Court has stated:

> Consistent with the overall purpose of Crim.R. 16, lower courts have found that "'[t]he purpose of Crim.R. 16(K) is to avoid unfair surprise by providing notice to the defense and allowing the defense an opportunity to challenge the expert's findings, analysis, or qualifications, possibly with the support of an adverse expert who could discredit the opinion after carefully reviewing the written report.'" *State v. Fetty*, 11th Dist. Portage No. 2011-P-0091, 2012-Ohio-6127, ¶ 36, quoting *State v. Perry*, 11th Dist. Lake No. 2011-L-125, 2012-Ohio-4888, ¶ 55; *see also State v. Buck*, 2017-Ohio-273, 81 N.E.3d 895, ¶ 33 (9th Dist.).

*Boaston*, 2020-Ohio-1061, at ¶ 48. In *Boaston*, the Court determined that the State had violated Crim.R. 16(K) where the medical examiner's expert testimony went beyond the supplied expert report. The *Boaston* Court noted that Crim.R. 16(K) removes the trial court's discretion and *requires* the exclusion of expert testimony where a written report had not been disclosed in accordance with the rule.

{¶ 30} This case presents a unique situation because, as the State maintains, Dyer did not make any expert conclusions prior to his real-time fingerprinting of Jemison and subsequent comparison to the fingerprints taken with the prior convictions. However, we do not believe that this absolves the State of compliance with Crim.R. 16(K). According to the arguments made in the trial court, the State did not provide any information regarding Jemison's fingerprints or prior convictions to the defense during discovery. The State seems to suggest that it was relying on the "usual" practice of defendants stipulating to their prior convictions and that it was unaware that Jemison was not going to stipulate. However, Jemison's counsel asserted that the State had not asked for a stipulation until the

day before trial.  We cannot condone such an approach; a failure to stipulate places the burden of proof on the State.  We find that the trial court erred in admitting Dyer's testimony when the State had not complied with Crim.R. 16(K).

{¶ 31} Nevertheless, the *Boaston* Court stated that after finding a Crim.R. 16(K) violation, appellate courts must then analyze whether the error was reversible or merely harmless under Crim.R. 52(A).  This rule defines the harmless-error doctrine in criminal cases and provides that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded."  "'The harmless-error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence. . . .'" *State v. Keith*, 1997 Ohio App. LEXIS 914, \*25 (8th Dist. Mar. 13, 1997), quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986).

{¶ 32} The *Boaston* Court set forth the following analysis:

"First, it must be determined whether the defendant was prejudiced by the error, i.e., whether the error had an impact on the verdict. [*Morris*] at ¶ 25 and 27.  Second, it must be determined whether the error was not harmless beyond a reasonable doubt.  *Id*. at ¶ 28.

Lastly, once the prejudicial evidence is excised,  the remaining evidence is weighed to determine whether it establishes the defendant's guilt beyond a reasonable doubt.  *Id*. at ¶ 29, 33."

*Id*. at ¶ 63, quoting *State v. Harris*, 2015-Ohio-166, ¶ 37, citing *State v. Morris*, 2014-Ohio-5052.

{¶ 33} The *Boaston* Court determined that the defendant had not been prejudiced by the admission of the additional expert testimony, and the defendant's guilt had been overwhelmingly established even without that evidence.

{¶ 34} Here, we do not find that Jemison was prejudiced by the admission of Dyer's testimony. Jemison had no objection to Dyer's qualification as an expert witness nor did he object to being fingerprinted during the trial. He does not argue that he would have brought in a contrary expert to demonstrate that the fingerprints on the card from the 2021 convictions in State's exhibit No. 2 actually did not belong to him.

{¶ 35} Jemison argues in his brief that the State was "relying entirely on [Dyer's] testimony to establish the prior conviction[s]," but the jury also heard the testimony of Det. McKenzie wherein she stated that she had run Jemison's name through the Ohio Law Enforcement Gateway ("OHLEG") and found the 2021 convictions. Further, Det. McKenzie stated that T.F. identified Jemison through a photograph obtained from OHLEG. Accordingly, even if it was error to allow Dyer to testify as an expert, it was harmless error.

{¶ 36} Jemison further argues that the names of the victim, the responding officer, and the investigating detective were not on the witness list provided by the State during discovery. The State acknowledges that these individuals were not specifically on the witness list provided to Jamison but that the failure to supply the list was not willful. The State contends that Jemison was fully aware of the witnesses because one was the victim, T.F., and the remaining two were officers who were

listed in the written reports and who sat at the trial table. Further, the State argues that any statements made by the victim and police had been provided to Jemison during discovery.

{¶ 37} Crim.R. 16(I) provides that "[e]ach party shall provide to opposing counsel a written witness list, including names and addresses of any witness it intends to call in its case-in-chief, or reasonably anticipates calling in rebuttal or surrebuttal." The Ohio Supreme Court has set out a test for determining whether the State's failure to comply with Crim.R. 16 constitutes reversible error:

> Prosecutorial violations of Crim.R. 16 are reversible only when there is a showing that (1) the prosecution's failure to disclose was a willful violation of the rule, (2) foreknowledge of the information would have benefited the accused in the preparation of his [or her] defense, and (3) the accused suffered some prejudicial effect.

*State v. Joseph*, 73 Ohio St.3d 450, 458 (1995), citing *State v. Parson*, 6 Ohio St.3d 442, 445 (1983).

{¶ 38} We find no evidence that the State willfully failed to disclose the victim or the officers as witnesses, that foreknowledge that the victim or the officers were going to testify would have benefitted Jemison's defense, or that Jemison suffered any prejudice.

{¶ 39} In *Mayfield Hts. v. Molk*, 2005-Ohio-1176 (8th Dist.), this court agreed with the trial court's ruling that the defendant was not unfairly prejudiced when the prosecutor failed to provide him with a witness list in discovery. This court reasoned that the defendant "had an opportunity to view the police report at

previous pretrials and was in possession of a copy of his ticket, which indicated the arresting officer's name and badge number." *Id.* at ¶ 12.

{¶ 40} In *State v. Standen*, 2006-Ohio-3344 (9th Dist.), the defendant sought exclusion of a police officer's testimony when the State had failed to disclose the officer as a witness in a timely manner. The Ninth District found that the trial court did not err in allowing the police officer to testify because the defendant received a copy of the police report in response to his discovery request and the report had identified the officer and noted that he was present at the scene. *Id.* at ¶ 16. The court concluded that the defendant failed to demonstrate any willful failure by the State to disclose the witness's identity or that the defendant suffered any prejudicial effect. *Id.*

{¶ 41} In this case, the trial court determined that the State had substantially complied with Crim.R. 16 because the victim's and the officers' names were on documents provided to the defense in discovery. The victim was listed in the indictment, the bill of particulars, and the police report, all of which were provided to Jemison in the State's first response to his request for discovery. Further, the two officers' identities were disclosed in their written reports. The record reflects that the State's supplemental response to request for discovery stated: "Any and all persons identified in the reports and other documentation provided to defense in discovery shall be deemed potential witnesses for the prosecution."

{¶ 42} In light of the above, we find that the trial court did not abuse its discretion when it allowed the victim and the officers to testify. Even if the witnesses

were not listed on the witness list, they had previously been disclosed to Jemison and consequently, he suffered no prejudice.

{¶ 43} Jemison's third assignment of error is overruled.

## B. Sufficiency of the Evidence

{¶ 44} In his first assignment of error, Jemison argues that the State did not present sufficient evidence to prove (1) that he had previously been convicted of domestic violence and child endangering, (2) that he created a substantial risk to the health and safety of the child with regard to the child endangering conviction, and (3) that he had knowingly caused harm to T.F.

{¶ 45} "Crim.R. 29(A)(1) provides that a court 'shall order the entry of the judgment of acquittal of one or more offenses . . . if the evidence is insufficient to sustain a conviction of such offense or offenses.'" *State v. McQuisition*, 2024-Ohio-3011, ¶ 24 (8th Dist.). "A Crim.R. 29 motion questions the sufficiency of the evidence, and we apply the same standard of review to a trial court's ruling on a Crim.R. 29 motion as we do in reviewing challenges to the sufficiency of the evidence presented at trial." *Id.*, citing *Fairview Park v. Peah*, 2021-Ohio-2685, ¶ 37 (8th Dist.).

{¶ 46} "'[A]n appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of defendant's guilt beyond a reasonable doubt.'" *Id.* at ¶ 25, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991). "'The relevant inquiry is whether, after viewing the

evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *Id.*, quoting *id.* at paragraph two of the syllabus, citing *Jackson v. Virginia*, 443 U.S. 307 (1979). "'In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law.'" *Id.*, quoting *State v. Thompkins,* 78 Ohio St.3d 380, 386 (1997).

### 1. Domestic Violence

{¶ 47} Jemison argues that the State did not provide sufficient evidence that he knowingly caused physical harm to the victim. Jemison contends that T.F. testified that she instigated the yelling and the physical altercation and that his actions were an attempt to defend himself.

{¶ 48} Jemison was convicted of domestic violence in violation of R.C. 2919.25(A), which provides that "[n]o person shall knowingly cause or attempt to cause physical harm to a family or household member."[2] A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. R.C. 2901.22(B). "Physical harm to persons" is defined as "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3). But in order to be convicted of domestic violence, actual physical harm is not required; the

---

[2] For purposes of the domestic-violence statute, a person can be considered a "family or household member" if she is "the natural parent of any child of whom the offender is the other natural parent . . . ." R.C. 2919.25(F)(1)(b). It is undisputed that Jemison and T.F. had a child together. Thus, under R.C. 2919.25(F)(1)(b), T.F. qualified as a "family or household member."

statute criminalizes knowingly *attempting* to cause physical harm. *Parma v. Singh*, 2018-Ohio-5235, ¶ 18 (8th Dist.), citing *Cleveland Hts. v. Brewer*, 109 Ohio App.3d 838 (8th Dist. 1996). "'Knowingly' does not require the defendant to have a specific intent to cause a certain result; rather, that is the definition of 'purposely.'" *State v. Stover*, 2017-Ohio-291, ¶ 14 (8th Dist.), citing *State v. Miller*, 2013-Ohio-3194, ¶ 30 (3d Dist.).

{¶ 49} T.F. testified that Jemison swung at her, charged at her, caused the closet door to fall, and held his wrist against her throat while continuing to hit her. It is reasonable to infer that Jemison was aware that by hitting T.F. and holding his wrist to her neck, he would probably cause her some injury, even if only slight and fleeting. *See Middleburg Hts. v. Musa*, 2013-Ohio-366 (8th Dist.) (finding the defendant acted knowingly where he was struggling with his wife for the car keys and was dragging her from their son's room to the outside of the residence and, thus, he was aware that he would probably cause some injury, albeit slight); *State v. Bailey*, 2012-Ohio-3274 (2d Dist.) (finding the defendant acted knowingly where he punched his mother in the back and attempted to knock her forcefully to the ground and, thus, he was aware that his actions would likely cause her injury).

{¶ 50} Even if there was no evidence presented of actual injuries to T.F., there was certainly testimony that Jemison had attempted to cause physical harm to her. Moreover, while Jemison argues that he was merely defending himself, he did not argue self-defense at trial nor did he seek a self-defense instruction.

## 2. Endangering Children

{¶ 51} R.C. 2919.22(A) governs the offense of child endangering and provides that "[n]o person, who is the parent . . . of a child under eighteen years of age . . . shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support. . . ." A "substantial risk" is "a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." R.C. 2901.01(A)(8). "A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result, or is likely to be of a certain nature." R.C. 2901.22(C). Thus, to support a conviction for child endangering under R.C. 2919.22(A), it must be established, beyond a reasonable doubt, that Jemison (1) recklessly (2) created a substantial risk to the health or safety of one of his children (3) by violating a duty of care, protection or support.

{¶ 52} As this court has stated:

R.C. 2919.22(A) is "'aimed at preventing acts of omission or neglect'" involving a child. *State v. Bennett*, 7th Dist. Mahoning No. 12 MA 223, 2013-Ohio-5524, ¶ 19, quoting *State v. Newman*, 4th Dist. Ross No. 94CA2079, 1995 Ohio App. LEXIS 3713 (Aug. 18, 1995). As such, it is not necessary to show an actual injury or a pattern of physical abuse by the defendant in order to support a conviction under R.C. 2919.22(A). *Id.*, citing *State v. Kamel*, 12 Ohio St.3d 306, 308, 12 Ohio B. 378, 466 N.E.2d 860 (1984). A child endangering conviction may be based upon isolated incidents or even "a single rash decision" in which a parent recklessly puts his or her child's health or safety at risk. *State v. James*, 12th Dist. Brown No. CA2000-03-005, 2000 Ohio App. LEXIS 5905, *6-7. However, "'[t]o prove the requisite "substantial risk" element, . . . there must be some evidence beyond mere speculation as to the risk of harm that could potentially occur due to a single imprudent act.'" *State v. Hughes*, 3d Dist. Shelby No. 17-09-02, 2009-Ohio-4115, ¶ 21,

quoting *Middletown v. McWhorter*, 12th Dist. Butler No. CA2006-03-068, 2006-Ohio-7030, ¶ 11.

*Cleveland Hts. v. Cohen*, 2015-Ohio-1636, ¶ 27 (8th Dist.).

{¶ 53} In the instant matter, the three-month-old baby was lying on a bed in the room where the altercation between T.F. and Jemison was occurring. T.F. testified that Jemison was intoxicated and charged at her. At one point, the closet door fell. While it is unclear from the record how far away the baby was from the closet door when it fell, the fact that it happened at all emphasizes the risk created by Jemison's actions.

{¶ 54} While Jemison argues that there was no evidence that the baby was harmed, the State was not required to demonstrate actual harm. Jemison attempts to rely on *Cohen*, where this court had found insufficient evidence of child endangering where the two children had witnessed an altercation between their parents but were not themselves at risk of harm. However, *Cohen* is distinguishable in two important ways: (1) the children in *Cohen* were upstairs when the altercation between their parents began downstairs; the baby here was in the very same room, and (2) the children in *Cohen* were 10 and 13 years of age — not a helpless infant who would be unable to move out of the way if necessary.

### 3. Furthermore Clauses

{¶ 55} Finally, Jemison argues that the State failed to present sufficient evidence with regard to the furthermore clauses that he was previously convicted of domestic violence and child endangering.

{¶ 56} R.C. 2945.75(B)(1) provides that when "it is necessary to prove a prior conviction, a certified copy of the entry of judgment in such prior conviction together with evidence sufficient to identify the defendant named in the entry as the offender in the case at bar, is sufficient to prove such prior conviction." Here, the State introduced certified copies of the journal entries related to Jemison's 2021 convictions for domestic violence and child endangering. Det. McKenzie testified that she ran Jemison's prior criminal history through OHLEG and found the prior convictions. Det. McKenzie stated that T.F. identified Jemison by his photograph from OHLEG. (Tr. 306.) Jemison did not assert any argument that he was not the individual in the 2021 convictions.

{¶ 57} Viewing the evidence in a light most favorable to the State, we find that sufficient evidence was presented in support of each conviction. Jemison's first assignment of error is overruled.

## C. Manifest Weight of the Evidence

{¶ 58} In his second assignment of error, Jemison argues that his convictions were against the manifest weight of the evidence. He reiterates the same arguments from his sufficiency argument above and also contends that there was no corroboration of the assault of T.F.

{¶ 59} In determining whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost

its way and created such a miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins*, 78 Ohio St.3d at 387. "A conviction should be reversed as against the manifest weight of the evidence only in the most 'exceptional case in which evidence weighs heavily against conviction.'" *Id*. at 387.

{¶ 60} Jemison asserts that T.F. testified that she was not harmed, not afraid of Jemison, and that the baby was never in danger from him. First, the State was not required to prove that T.F. suffered actual harm or that she was afraid of Jemison. Based on the record before us, we cannot conclude that the baby was never in danger from Jemison. Ofc. Fitchwell acknowledged that no photographs were taken of any injuries and no witnesses were investigated; however, again, the State was not required to prove an actual injury to T.F. Further, since there was no testimony that there was anyone else in the home, we cannot conclude that the testimony of others was necessary in order to convict Jemison of the events that occurred inside the apartment.

{¶ 61} Based on the foregoing, we are unable to find that this is the exceptional case where the jury clearly lost its way and created a manifest miscarriage of justice such that a new trial should be ordered. Jemison's second assignment of error is overruled.

## D. Jury Instructions

{¶ 62} In his fourth assignment of error, Jemison argues that the trial court improperly instructed the jury regarding his prior convictions. Specifically, Jemison argues that the trial court used *Ohio Jury Instructions,* CR § 401.25(5) (Rev. Nov.

23, 2024) to instruct the jury on other acts and prior convictions, but it improperly also instructed the jury on additional other acts in *Ohio Jury Instructions,* CR § 401.25(1)(A)-(D) (Rev. Nov. 23, 2024). The jury was consequently advised that it could consider Jemison's prior conviction for domestic violence for purposes beyond simply the proof that he had been previously convicted.

{¶ 63} "The giving of jury instructions is typically within the sound discretion of the trial court, and we review it for an abuse of discretion." *State v. Davis*, 2021-Ohio-2311, ¶ 29 (8th Dist.). An abuse of discretion occurs when a court exercises "its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.

{¶ 64} Jemison acknowledges that his trial counsel did not object to the instruction. A party waives on appeal any issue regarding jury instructions if they fail to object before the instructions are given to the jury. Crim.R. 30(A). As Jemison failed to object to the proposed jury instructions, he has waived all but plain error.

{¶ 65} "Where the defense fails to request a limiting instruction on other acts evidence, the trial court's failure to give such an instruction is not plain error where nothing suggests the jury used other acts evidence to convict the defendant because he was a bad person." *State v. Jeffries*, 2018-Ohio-162, ¶ 30 (8th Dist.). Jemison has made no such showing.

{¶ 66} Jemison's fourth assignment of error is overruled, and the judgment of the trial court is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, PRESIDING JUDGE

MARY J. BOYLE, J., and
MICHAEL JOHN RYAN, J., CONCUR